**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **SAMANTHA GATES, CURTIS MOORE**, and **VANESSA PAWLAK**, <br><br> Plaintiffs, <br><br> v. <br><br> **CENTRIA HEALTHCARE, SCOTT BARRY, ALICIA DECKER KIDWELL, KYLE KIDWELL, RICHARD LOWENSTEIN, STEVEN MERAHN, M.D., MARK MITCHELL, MICHELLE CARTER PIERCE, DARREN SCHWARTZ, JEFFREY STEIGERWALD**, and **CHRIS WILCOX**, <br><br> Defendants. | **No. 2:19-cv-10941-SFC** <br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiffs and *qui tam* Relators Samantha Gates, Curtis Moore, and Vanessa Pawlak, by and through their undersigned counsel Brown, LLC, hereby allege of personal knowledge as to their own observations and actions, and on information and belief as to all else, as follows:

**I.
INTRODUCTION**

1.     Relators, who are all former high-level employees of Defendant Centria Healthcare ("Centria"), bring this *qui tam* action on behalf of the United States of America under the federal False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), to recover three times the damages sustained by, and civil penalties owed to, the United States as a result of a scheme by

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Defendants to commit fraud. Defendants have defrauded the United States by seeking and obtaining reimbursement from Michigan Medicaid[1] and from the TRICARE program by means of claims that are factually false, legally false, or both.

2.      Specifically, Defendant Centria, a provider of services to persons with autism spectrum disorder ("ASD"), along with the individual Defendants (who were and/or are decision-makers for Centria), knowingly submitted to TRICARE and Michigan Medicaid during the statutory period:

      a.   claims for ASD services that were provided by unqualified personnel;

      b.   claims for ASD services that were not actually provided;

      c.   claims for ASD services that were not medically necessary;

      d.   claims that were tainted by kickbacks; and

      e.   claims that were otherwise improper.

3.      TRICARE and Michigan Medicaid paid Defendants millions of dollars on these claims.

4.      Numerous other irregularities and failures of compliance make suspect most if not all of the claims that Centria submitted to TRICARE and Michigan Medicaid during the statutory period.

---

[1] Because Medicaid is jointly funded by both federal and state governments, *see infra*, the United States has a cause of action under the federal False Claims Act for false claims made to state Medicaid programs. *See, e.g., Hays v. Hoffman*, 325 F.3d 982, 988 (8th Cir. 2003) ("When Congress amended the FCA in 1986, it defined 'claim' to include requests for money made to grantees of the federal government. The legislative history explained this was done to clarify that false claims for FCA purposes include claims submitted to state agencies under the Medicaid program and other State, local, or private programs funded in part by the United States where there is significant Federal regulation and involvement.") (internal citation and quotation marks omitted; citing S. Rep. No. 99-345 at 22, 1986 U.S.C.C.A.N. at 5287); *Kane ex rel. United States v. Healthfirst, Inc*., 120 F. Supp. 3d 370, 396 (S.D.N.Y. 2015) ("Congress has repeatedly and specifically provided that claims submitted to Medicaid constitute false claims for the purposes of the FCA.") (citing, *inter alia*, S. Rep. No. 111-10, at 11, 2009 U.S.C.C.A.N. at 438, explaining that the 2009 Fraud Enforcement and Recovery Act clarified that "the FCA reaches all false claims submitted to State administered Medicaid programs.").

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

5.     Relators seek justice for the United States, the party that was defrauded. In addition, Relators seek some measure of justice for those whom Defendants purported to serve. Unfortunately, Defendants' fraud deprived these vulnerable families and individuals affected by ASD of something they can never recover – the chance for greater emotional wellbeing and a fuller, more productive life.

6.     Relators demand from Defendants, jointly and severally, on behalf of the United States, treble the actual damages suffered (the exact amount to be proven at trial); a civil penalty for each false claim submitted, in the maximum amount allowed under federal law; the reasonable attorney fees and costs of the United States and Relators; interest; and all other relief that this Court deems just and proper.

7.     Relator Vanessa Pawlak was terminated by Defendants in retaliation for her efforts to put a stop to their fraud. Therefore, in addition to the claims of the United States, Relator Pawlak brings claims on her own behalf under § 3730(h) of the FCA. Relator Pawlak demands from Defendants, jointly and severally, the full measure of damages available under that statute, in an amount to be determined at trial.

## II.
## BACKGROUND

### A.     Autism Spectrum Disorder:
### Generally, and in Michigan

1.     About one American child in every 59 has ASD,[2] according to estimates published in April 2018 by the CDC. Another estimate, by the American Association of Pediatricians, puts the rate as high as *one in every 40* children ages 3-17.

---

[2] Autism spectrum disorder (ASD) "refers to a broad range of conditions characterized by challenges with social skills, repetitive behaviors, speech and nonverbal communication," and is often accompanied by sensory issues (such as aversions to certain sights, sounds and other sensations), and by medical issues (such as gastrointestinal disorders, sleep disturbances, and seizures). https://www.autismspeaks.org/what-autism (last accessed Feb. 2, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

2.      ASD is "a life-long neurological disability that is characterized by significant social-communication and behavioral deficits."[3] Most individuals with ASD "have difficulty socializing with others, communicating verbally or non-verbally, and behaving appropriately in a variety of settings."[4]

3.      Slightly more than half of all children with ASD are either intellectually disabled or borderline-disabled.

4.      According to the CDC, the total costs per year for U.S. children with ASD have been estimated to be as much as $60.9 billion (2011 dollars), representing "a variety of direct and in-direct costs, from medical care to special education to lost parental productivity."[5] Intensive behavioral interventions for children with ASD can cost $40,000 to $60,000 per child per year.

5.      And of course, ASD doesn't affect only young children. According to one advocacy organization, "[e]ach year, an estimated 50,000 teens with autism age out of school-based services [nationwide],"[6] and, according to the same organization, "[t]he nation still lacks any reliable estimate of autism's prevalence among adults."[7]

6.      Analysts have pegged the total annual cost of autism services in the U.S. at approximately $250 billion, with lifetime per-patient costs of $1.4 million to $3.2 million.

7.      It has been reported that at least 50,000 Michigan residents have ASD. In the 2017-2018 school year, 20,595 students with ASD were enrolled in Michigan schools.

8.      The State of Michigan, through its Department of Health and Human Services ("MDHHS"), established the Michigan Autism Spectrum Disorder State Plan in 2012 (the "State

---

[3] "About Autism Spectrum Disorder," Michigan Department of Health and Human Services ("MDHHS"), https://www.michigan.gov/autism/0,4848,7-294-63677---,00.html (last accessed Feb. 2, 2019).
[4] *Id.*
[5] https://www.cdc.gov/ncbddd/autism/data.html (last accessed Feb. 2, 2019).
[6] https://www.autismspeaks.org/science-news/cdc-increases-estimate-autisms-prevalence-15-percent-1-59-children (last accessed Feb. 2, 2019).
[7] *Id.*

4

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Plan"). At the time, the CDC had labeled ASD an "urgent public health concern" – when the prevalence was only *one in every 88* children.[8]

9. Recognizing "the long-term impact on individual lives and the lives of family members if effective services and supports are not provided from a young age and throughout adulthood," Michigan created the State Plan in hopes of making "a substantial difference in the lives of individuals with ASD and their families and [averting] significant financial costs to the state."[9]

10. Since 2012, as part of the development and implementation of the State Plan, Michigan has required that insurance carriers, including Michigan Medicaid, pay for Behavioral Health Treatment ("BHT"), including Applied Behavior Analysis, for individuals with ASD.

11. According to the MDHHS, "Applied Behavior Analysis ('ABA') is a recommended service for children with Autism Spectrum Disorder. It has been researched for over 30 years and endorsed by the Surgeon General. ABA services can be used to address skills and behaviors relevant to children with Autism Spectrum Disorder. ABA services commonly address areas including, but not limited to, the following: Language skills; Social skills; Communication skills; Following instructions; Peer interactions; Following daily routines; Self-help and daily living skills; [and] Behavior challenges."[10] The therapy "applies our understanding of how behavior works to real situations," with the goal of "increas[ing] behaviors that are helpful and decreas[ing] behaviors that are harmful or affect learning."[11]

---

[8] *See* Michigan Autism Spectrum Disorder State Plan Executive Summary, Dec. 2012 ("2012 Summary"), available at https://www.michigan.gov/documents/autism/ASDExecSummary_2_14_13_413795_7.pdf (last accessed Feb. 2, 2019), at 2.
[9] *Id.*
[10] https://www.michigan.gov/autism/0,4848,7-294-63682---,00.html (last accessed Feb. 2, 2019).
[11] https://www.autismspeaks.org/applied-behavior-analysis-aba-0 (last accessed Feb. 2, 2019).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

12.    Michigan Medicaid coverage was originally limited to children up to five years of age, but was expanded in 2016 to include children and youths up to 21 years.

13.    Michigan Medicaid funding for ASD services has grown significantly every year since 2013 with the implementation of the State Plan, as the following graphic shows:[12]



14.    Even though the State has mandated that insurances cover ABA therapy since 2012, it did not create a certification program for ABA therapists until 2016.

---

[12] Anderson and Wisely, "Abuse caught on video at Michigan's biggest autism therapy provider," Detroit Free Press, Oct. 6, 2018, *available at* https://www.wzzm13.com/article/news/local/michigan/abuse-caught-on-video-at-michigans-biggest-autism-therapy-provider/69-601624700 (last accessed Mar. 15, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

B.      **Centria and the ASD Gold Rush**

15.     Defendant Centria was well positioned to take advantage of increased spending on ASD services, in Michigan and across the country. The company was formed in 2009 by Defendant Scott Barry, and began providing ABA services in Michigan in 2010. "[B]y 2015, Centria was the largest single provider in Michigan – helping more than 230 families – and had expanded to Texas."[13] In addition to Michigan and Texas, Centria currently offers services in Arizona, California, Massachusetts, New Jersey, New Mexico, Oregon, and Washington,[14] and plans "to expand services to Colorado, Florida, Georgia, Illinois, Indiana … Maryland, New York, North Carolina and Ohio" are currently "in various stages of evaluation and launch."[15]

16.     On information and belief, Centria billed more than $20 million in 2017 for ASD services it purported to provide to Michigan Medicaid beneficiaries.

17.     According to the company's website, nearly 3,500 full and part-time employees now work in Centria's autism-services segment nationwide.[16] The company serves more than 2,300 families, and hopes to reach 20,000 families by 2022.[17]

18.     Centria is riding the industry trend. The U.S. autism therapy "market" was estimated at $1.87 billion in 2017, growing to $2.23 billion by 2022. As noted *supra*, "intensive behavioral interventions" – including ABA therapy – for children with ASD can cost $40,000 to $60,000 per child, per year. Clearly, there is big money to be made, and private equity firms have taken notice. Autism services have been described as "the hottest sub-segment within the

---

[13]  https://www.crainsdetroit.com/sponsored-content/centria-growing-mission-serve-people (last accessed Feb. 2, 2019).

[14] https://www.linkedin.com/company/centria-healthcare (last accessed Mar. 9, 2019).

[15] *Id.*

[16] https://centriahealthcare.com/about-centria-healthcare (last accessed Feb. 2, 2019).

[17]  https://www.crainsdetroit.com/sponsored-content/centria-growing-mission-serve-people (last accessed Feb. 2, 2019).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

behavioral health space," with at least 14 private equity deals in 2017 alone.[18] And Centria has its own private equity investor: Lorient Capital of Birmingham, Michigan, of which Defendant Mark Mitchell is CEO, Managing Partner, and co-founder.

19.     The investor "gold rush" has led to worries that providers will cut corners in pursuit of profits.[19] And, as Relators discovered, those concerns were certainly warranted with regard to Centria, where the investors' desire for profit and the personal greed of Defendants Barry and Mitchell led to the fraud detailed herein.

### III.
### THE PARTIES

**A.      Defendants**

20.     Defendant Centria Healthcare is a domestic for-profit company, incorporated in 2009 under the laws of the State of Michigan as a provider of in-home pediatric nursing and catastrophic-injury care. The company added ASD services to its offerings in 2010. Centria does business within this judicial District, and is headquartered in Novi, Michigan, a municipality within this judicial District.

21.     Defendant Scott Barry is the founder and CEO of Centria. On information and belief, he resides in this judicial District.

---

[18] https://thebraffgroup.com/market-sectors/behavioral-health/ (last accessed Feb. 3, 2019).
[19] *See, e.g.*, Perkes, C., "As Demand For ABA Therapy Increases, Investors Buy In," *Disability Scoop*, Oct. 23, 2018, *available at* https://www.disabilityscoop.com/2018/10/23/as-demand-aba-investors-buy-in/25619/ (last accessed Feb. 3, 2019) ("Autism therapy is attracting significant attention from private equity firms, a trend that could fund rapid expansion of clinics, but is also raising concerns about quality of care. … Some autism advocates welcome an expansion of services, while also cautioning that unchecked growth could cause lapses in training or oversight."); Furfaro, H., "Optimism greets investors' sudden interest in autism therapy," *Spectrum*, July 9, 2018, *available at* https://www.spectrumnews.org/news/optimism-greets-investors-sudden-interest-autism-therapy/ (last accessed Feb. 3, 2019) ("The care offered at certain ABA centers is already outdated or low quality, others say; offering mediocre care more widely does not serve families well. 'They have the potential of expanding an ineffective program.'" (quoting Lynn Koegel, clinical professor of psychiatry and behavioral sciences at Stanford University)).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

22.     Defendant Alicia Decker Kidwell is Vice President of Autism Services for Centria. On information and belief, she resides in this judicial District.

23.     During all times relevant herein, Defendant Kyle Kidwell was Quality Assurance and Efficiency Manager for Centria. He is the husband of Defendant Alicia Decker Kidwell. On information and belief, he resides in this judicial District.

24.     During all times relevant herein, Defendant Richard Lowenstein was Chief Strategy and Growth Officer for Centria. On information and belief, he resides in this judicial District.

25.     Defendant Steven Merahn, M.D., is and during all times relevant herein has been Chief Medical Officer/Clinical Operations for Centria. On information and belief, Dr. Merahn was formerly the Chief Medical Officer and EVP of Operations for U.S. Medical Management, a Michigan provider of in-home healthcare, of which Defendant Mark Mitchell was CEO. On information and belief, Defendant Merahn resides in this judicial District.

26.     Defendant Mark Mitchell is CEO, Managing Partner, and co-founder of Lorient Capital. On information and belief, Mitchell also sits on the board of Centria. He is a personal friend of Defendant Scott Barry, the CEO of Centria. At all times relevant herein, Lorient Capital has had significant investment in Centria, and Mitchell himself has had significant involvement in Centria's day-to-day operations. Defendant Barry told Relator Pawlak personally, on more than one occasion, that he thought a Chief Compliance Officer was a waste of money but that Mitchell insisted that the company have someone in that position as a condition of his investment. Defendant Mitchell was the final person to interview Relator Pawlak for her job, and

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

after she raised too many questions about Centria's operations, it was Mitchell who personally fired her. On information and belief, Defendant Mitchell resides in this judicial District.[20]

27.    During all times relevant herein, Defendant Michelle Carter Pierce was General Counsel for Centria. She currently holds the additional position of Chief Compliance Officer, having assumed that position after the termination of the previous CCO, Relator Vanessa Pawlak. On information and belief, she resides in this judicial District.

28.    During all times relevant herein, Defendant Darren Schwartz was Chief Sales and Marketing Officer for Centria. On information and belief, he resides in this judicial District.

29.    During all times relevant herein, Defendant Jeffrey Steigerwald was Vice President of Operations and Client Services for Centria. Steigerwald is the cousin of Defendant Chris Wilcox. On information and belief, he resides in this judicial District.

30.    During all times relevant herein, Defendant Chris Wilcox was President of Centria. Wilcox is the cousin of Defendant Jeffrey Steigerwald. On information and belief, he resides in this judicial District.

**B.    Plaintiffs and Relators**

31.    Relator Samantha Gates was the Training Program Manager for Centria from approximately March 2016 until she left the company voluntarily in approximately August 2017, in part because of concerns about the company's fraud. She has worked in the human resources field since approximately 2009. She currently resides in the Atlanta area, but during all times relevant herein she resided within this judicial District.

---

[20] Mitchell also has a checkered history in the healthcare field. Visiting Physicians Association, which he founded and ran, agreed in 2009 to repay the federal government $9.5 million to settle claims of overbilling Medicare, TRICARE, and Michigan Medicaid. *See* https://www.justice.gov/opa/pr/visiting-physicians-association-pay-95-million-resolve-false-claims-act-allegations (last accessed Feb. 3, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

32.     Relator Curtis Moore was Senior Sales Executive for Centria from approximately August 2015 until his retaliatory termination in approximately May 2017. He has more than 15 years' experience in sales in the medical and pharmaceutical industries, and has worked for three of the largest pharmaceutical companies in the world. He resides within this judicial District.

33.     Relator Vanessa Pawlak was Chief Compliance Officer and Senior Vice President for Centria from November 28, 2016 until her retaliatory termination on February 3, 2017 – a little less than ten weeks. She has extensive experience in operations engineering and compliance, primarily in healthcare, and holds certificates in Healthcare Compliance and Healthcare Privacy Compliance. She resides within this judicial District.

34.     During all times relevant herein, Plaintiff the United States, acting through the Centers for Medicare & Medicaid Services ("CMS"), has provided funds to Michigan Medicaid, some of which were then used to reimburse Defendant Centria for ASD services it provided (or purported to provide) to eligible individuals. Centria has also sought and obtained reimbursement from the TRICARE program administered by the Defense Health Agency ("DHA"), a unit of the Department of Defense ("DOD"). The United States has been damaged in the amount of the payments these two programs made to reimburse Centria for its fraudulent claims, and Relators bring this action on behalf of the United States for those damages.

**IV.**
**JURISDICTION AND VENUE**

35.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, because this action is brought for violations of the federal False Claims Act, 31 U.S.C. § 3729 *et seq*.

36.     The Court has personal jurisdiction over Defendants because Defendants (a) are residents of, and are licensed to transact and do transact business in, this judicial District; and (b) have carried out their fraudulent scheme in this District.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

37.     Venue is proper in this judicial District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391 (b)(2), because Defendants can be found in, are licensed to do business in, and transact or have transacted business in this District, and events and omissions that give rise to these claims have occurred in this District. This District is the locus of the fraud.

38.     The Complaint has been filed within the time period prescribed by 31 U.S.C. § 3731(b).

## V.
## THE STATUTORY FRAMEWORK

### A.     The Medicaid Program

39.     Congress enacted Medicaid under Title XIX of the Social Security Act, 42 U.S.C. §§ 1396 *et seq.*

40.     Medicaid is jointly funded by the federal and state governments to provide health care to certain groups, primarily the poor and the disabled. *See* 42 C.F.R. §§ 430.0 *et seq*.

41.     CMS administers the Medicaid program at the federal level. Within a broad legal framework, each state designs and administers its own Medicaid program.

42.     Under the Medicaid program, the federal government pays a specified percentage of each state's Medicaid program expenditures, known as the Federal Medical Assistance Percentage. *See* 42 U.S.C. § 1396d(b).

43.     At all times relevant herein, the United States has paid the State of Michigan its Federal Medical Assistance Percentage, and the State itself has funded the remainder of its Medicaid expenditures.

### B.     Delivery of Mental and Behavioral Healthcare to Michigan Medicaid Beneficiaries

44.     Almost all Medicaid beneficiaries in Michigan are served by one of several types of managed care plans. Funding for mental and behavioral health services, including ASD

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

services such as those Defendants purport to provide, is administered by the State's Managed Specialty Supports and Services Program ("MSSSP"), which in turn makes per-patient per month capitated payments to Community Mental Health Service Programs ("CMHSPs") with which the MSSSP contracts. The CMHSPs then contract with and pay providers such as Centria who actually provide treatment and care.

45.     The result of this arrangement is that the money that CMHSPs pay to providers such as Centria comes from the federal, state, and county governments.

C.     **Medicaid Provider Requirements Generally**

46.     In order to enroll as a Medicaid provider, a healthcare entity must agree to abide by the rules, regulations, policies and procedures governing reimbursement, and to keep and allow access to records and information required by Medicaid. In order to receive Medicaid funds, enrolled providers in Michigan, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all policies and procedures applicable to Michigan Medicaid.

47.     At all times relevant herein, Defendant Centria has been an enrolled Michigan Medicaid provider. Centria is eligible to receive reimbursement for ASD services it provides to patients who are insured through Michigan Medicaid.

48.     In order to receive reimbursement, providers must submit a claim using Form CMS-1500[21] (or its digital equivalent) to the CMHSP to which a patient belongs. By signing a Form CMS-1500, a provider certifies that the services claimed "were medically indicated and

---

[21] *Available at* https://www.cms.gov/Medicare/CMS-Forms/CMS-Forms/Downloads/CMS1500.pdf (last accessed Feb. 1, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

necessary to the health of [the] patient and were personally furnished by [the provider or his/her employee] under [his/her] personal direction."

49.     Form CMS-1500 also requires providers to acknowledge that: "the foregoing information is true accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

50.     Moreover, the Michigan Medicaid Provider Manual[22] states that "services [and] supplies that are not medically necessary" "are not covered by the Medicaid program,"[23] and that:

> Providers certify by signature that a claim is true, accurate, and contains no false or erroneous information. The provider's signature or that of the provider's authorized representative may be handwritten, typed, or rubber-stamped on a paper claim.

> When a provider's warrant is endorsed or deposited, it is certification that the services billed were actually provided. It further certifies that the claims (paper or electronic) paid by the warrant accurately document that the health care services provided were within the limitation of Medicaid (or compliance with a contract). The warrant's certification applies to original claims as well as resubmitted claims and claim adjustments.

> Providers are held responsible for any errors, omissions, or resulting liabilities that may arise from any claim for medical services submitted to MDHHS under the provider's name or NPI number. Contractual arrangements (verbal or written) with employers, employees, contractors, etc. do not release the provider of the responsibility for services billed or signed under the provider's NPI number.

> Providers are responsible for the supervision of a subordinate, officer, employee, or contracted billing agent who prepares or submits the provider's claims.

*Id.* § 12.8.

51.     The submission, whether on paper or digitally, of such certifications in connection with a claim for payment from Michigan Medicaid, if false, is a violation of both the federal

---

[22] *Available at* https://www.michigan.gov/mdhhs/0,5885,7-339-71551_2945_42542_42543_42546_42553-87572--,00.html (last accessed Mar. 9, 2019).
[23] *Id.* § 8.3.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

False Claims Act and the Michigan Medicaid False Claims Act (*see infra*), and each such falsely certified claim is a separate violation.

52.     The overwhelming majority of Centria's patients are insured through either Medicaid or TRICARE. Throughout the statutory period, Defendants made the certifications set forth above or similar when submitting reimbursement claims to the various CMHSPs with which Centria contracted in Michigan, and made substantially similar certifications when submitting claims to the Medicaid programs of the other states in which the company operates.

**D.     Michigan Medicaid Requirements for ABA Programs and Clinicians**

53.     The Medicaid Provider Manual[24] sets out program requirements for ABA therapy, and states (as pertinent here) that "BHT [Behavioral Health Therapy] services must be provided under the direction of a BCBA [Board Certified Behavior Analyst] … or a Master's prepared QBHP [Qualified Behavioral Health Professional]. … The BCBA and other qualified providers are also responsible for communicating progress on goals to parents/guardians minimally every three to six months; clinical skill development and supervision of BCaBA [Board Certified Assistant Behavior Analyst], QBHP, and behavior technicians; and collaborating with support coordinators/case managers and the parents/guardians on goals and objectives with participation in development of the IPOS [Individual Plan of Service] that includes the behavioral plan of care." *Id.*, § 18.12.

---

[24] *Id.* § 18 of the chapter entitled "Behavioral Health and Intellectual and Developmental Disability Supports and Services."

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

54.     The Provider Manual also sets out minimum qualifications for the clinical positions/titles utilized by Centria:

### Board Certified Behavior Analyst- Doctoral (BCBA-D) or Board Certified Behavior Analyst (BCBA)

**Services Provided:** Behavioral assessment, behavioral intervention, and behavioral observation and direction.

**License/Certification:** Current certification as a BCBA through the BACB. The BACB is the national entity accredited by the National Commission for Certifying Agencies (NCCA).

**Education and Training:** Minimum of a master's degree from an accredited institution conferred in a degree program in which the candidate completed a BACB approved course sequence.

### Board Certified Assistant Behavior Analyst (BCaBA)

**Services Provided:** Behavioral assessment, behavioral intervention, and behavioral observation and direction.

**License/Certification:** Current certification as a BCaBA through the BACB. The BACB is the national entity accredited by the NCCA.

**Education and Training:** Minimum of a bachelor's degree from an accredited institution conferred in a degree program in which the candidate completed a BACB approved course sequence.

**Other Standard:** Works under the supervision of the BCBA.

### Qualified Behavioral Health Professional (QBHP) [also referred to within Centria as a Behavior Consultant ("BCs")]

Must be certified as a BCBA by September 30, 2020.

**Services Provided:** Behavioral assessment, behavioral intervention, and behavioral observation and direction.

**License/Certification:** A license or certification is not required, but is optional.

**Education and Training:** [A] QBHP must meet one of the following state requirements:

Must be a physician or licensed practitioner with specialized training and one year of experience in the examination, evaluation, and treatment of children with ASD[; or]

Minimum of a master's degree in a mental health-related field or BACB approved degree category from an accredited institution with specialized training and one year of experience in the examination, evaluation, and treatment of children with ASD. Works within their scope of practice, ***works under the supervision of the***

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

*BCBA*, and has extensive knowledge and training in behavior analysis. Extensive knowledge is defined as having received documented coursework at the graduate level (i.e. completion of three BACB evaluated graduate courses or BACB verified course sequences meeting specific standards toward certification) from an accredited university in at least three of the six following areas:

- Ethical considerations.
- Definitions and characteristics; and principles, processes and concepts of behavior.
- Behavioral assessment, and selecting interventions outcomes and strategies.
- Experimental evaluation of interventions.
- Measurement of behavior, and developing and interpreting behavioral data.
- Behavioral change procedures and systems supports.

**Behavior Technician**

**Services Provided:** Behavioral intervention.

**License/Certification:** A license or certification is not required.

**Education and Training:** Will receive BACB Registered Behavior Technician (RBT) training conducted by a professional experienced in BHT services (BCBA, BCaBA, LP, LLP, and/or QBHP), but is not required to register with the BACB upon completion in order to furnish services. ***Works under the supervision of the BCBA or other professional (BCaBA, LP, LLP or QBHP) overseeing the behavioral plan of care, with minimally one hour of clinical observation and direction for every 10 hours of direct treatment.*** Must be at least 18 years of age; able to practice universal precautions to protect against the transmission of communicable disease; able to communicate expressively and receptively in order to follow individual plan requirements and beneficiary-specific emergency procedures and to report on activities performed; and be in good standing with the law (i.e., not a fugitive from justice, a convicted felon who is either under jurisdiction or whose felony relates to the kind of duty to be performed, or an illegal alien). Must be able to perform and be certified in basic first aid procedures and is trained in the IPOS/behavioral plan of care utilizing the person-centered planning process.

*Id.*, § 18.12.A (emphasis added).

**E.    The TRICARE Program**

55.    In 1967, Congress created and the Department of Defense implemented the Civilian Health and Medical Program of the Uniformed Services ("CHAMPUS"). 10 U.S.C. § 1071. CHAMPUS is a federally funded program to provide medical and dental care to active

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

military personnel, retired personnel, and dependents of both active and retired personnel. *Id.*

56.     In 1995, the Department of Defense established TRICARE, a managed healthcare program, which operates as a supplement to CHAMPUS. *See* 32 C.F.R. §§ 199.4, 199.17(a). Both programs are frequently referred to collectively as TRICARE/CHAMPUS, or just "TRICARE."

57.     The purpose of the TRICARE program is to improve healthcare services to beneficiaries by creating "managed care support contracts" to pay civilian health care providers who care for TRICARE beneficiaries. 32 C.F.R. § 199.17(a)(1). The Defense Health Agency ("DHA") oversees TRICARE.

58.     Under CHAMPUS and TRICARE regulations claims, "including billings by providers when the claim is submitted by the beneficiary," are fraudulent when, *inter alia*, the claims:

    a.   involve "[m]isrepresentation by a provider of his or her credentials or concealing information or business practices which bear on the provider's qualifications";

    b.   are for services that were not actually rendered or involve "[m]isrepresentations of dates, frequency, duration, or description of services rendered, or of the identity of the recipient of the services or the individual who rendered the services"; or

    c.   "involve flagrant and persistent overutilization of services without proper regard for results, the patient's ailments, condition, medical needs, or the physician's orders";

*See* 32 C.F.R. § 199.9(c).

**F.     The False Claims Act**

59.     The False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA"), establishes treble damages liability for an individual or entity that:

    a.   "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3729(a)(l)(A);

    b.   "knowingly makes, uses, or causes to be made or used, a false record or statement material  to a false or fraudulent claim," *id.* § 3729(a)(l)(B); or

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

      c. "conspires to defraud the Government by getting a false or fraudulent claim allowed or paid," *id.* § 3729(a)(l)(C).

60.    "Knowing," within the meaning of the FCA, is defined to include reckless disregard and deliberate indifference. 31 U.S.C. § 3729(b).

61.    In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.[25]

62.    The FCA also provides for payment of a percentage of the government's recovery to a private individual who brings suit on behalf of the government (the "Relator") under the FCA. *See* 31 U.S.C. § 3730(d).

63.    The FCA also provides relief for an individual who is "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" in her employment in retaliation for his lawful acts to stop violations of the FCA. *See id.* § 3730(h)(1).

**G.    The Anti-Kickback Statute**

64.    The Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (the "AKS"), prohibits offering, paying, soliciting, or receiving "any remuneration" to induce services for which payment may be made under a federal health care program.

65.    A violation of the AKS is, in turn, a *per se* violation of the FCA. *See* 42 U.S.C. § 1320a-7b(g) ("[A] claim that includes items or services resulting from a violation of [the AKS] constitutes a false or fraudulent claim for purposes of [the FCA]").

---

[25] 31 U.S.C. § 3729(a)(1) provides a civil penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (28 U.S.C. § 2461 note; Public Law 104-410). The Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015, 28 U.S.C. § 2461 note, substituted a different statutory formula for calculating inflation adjustments on an annual basis. On January 29, 2018, the Department of Justice promulgated a Final Rule increasing the penalty for FCA violations occurring after November 2, 2015. For such penalties assessed after January 29, 2018, the minimum penalty is $11,181 and the maximum is $22,363. *See* 28 C.F.R. § 85.5; 83 F.R. 3945 (January 29, 2018). The DOJ is expected to publish a penalty increase for 2019, but has not yet done so.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

66.     As explained *infra*, Defendants violated and conspired to violate the aforementioned federal statutes on a massive scale.

# VI.
## DEFENDANTS' FRAUDULENT ACTS

**A.      Defendants presented claims to TRICARE and Michigan Medicaid for ASD services provided by unqualified or under-qualified personnel**

67.     In its effort to take advantage of the "gold rush" in ASD services, in Michigan and in the other states in which it operates, Centria expanded its workforce, frequently by hiring under-qualified personnel, and by not vetting its hires according to state regulations and guidelines.

68.     Relators Pawlak and Gates are personally aware of numerous clinicians who Centria "charged out" as supervisors (QBHPs), even though they did not meet the minimum coursework or experience requirements for that position per Michigan regulations.[26] In fact, the qualifications of many of these clinicians were impossible to assess because their personnel files did not contain official transcripts.

69.     In approximately late 2016, Defendant Alicia Decker Kidwell instructed an employee in HR Compliance to add fake certificates to the personnel files of those clinicians who lacked proof that they had completed required training. The employee refused and was eventually fired. The employee later provided to Relator Moore a file of over 70 clinicians who were rendering care and billing for their services but whose HR files lacked required items, such as I-9 documentation, MDHHS clearance to work with human beings, CPR certifications, and other training certifications.

---

[26] *See* ¶ 54, *supra.*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

70.    Many of the clinicians had lapsed licenses or were missing certificates of their mandatory CPR training. Many had no I-9 documentation[27] or appropriate DHHS clearances.

71.    The personnel files of many BTs contained certificates purporting to show that they had received the required Registered Behavioral Technician training. Under state regulations that training must be delivered by a Board Certified Behavioral Analyst (BCBA), but Relators Pawlak and Gates are personally aware that at least one Centria instructor was not a credentialed BCBA.

72.    Centria certified to TRICARE, Michigan Medicaid, and the Medicaid programs of other states that it conducted appropriate background checks on its workforce, when in fact it did not always do so because Defendant Barry thought that doing so would be too costly. Relator Pawlak personally witnessed a Centria employee falsifying affidavits to Magellan[28] and other payers, stating that Centria conducted appropriate background checks on clinicians, including fingerprinting them.

73.    Defendant Barry told Relator Pawlak that if an individual wanted to work at Centria, they would have to pay for their own fingerprinting. Most candidates refused to do so, and Centria would hire them anyway.

74.    Centria has sought and obtained TRICARE, Medicaid and other reimbursement for clinicians' services without first ensuring that they were not excluded by either the federal or state governments. Relators are personally aware that numerous convicted felons, including

---

[27] The I-9, officially the Employment Eligibility Verification, is a form of the United States Citizenship and Immigration Services. Mandated by the Immigration Reform and Control Act of 1986, it is used to verify the identity and legal authorization to work of all paid employees in the United States. *All U.S. employers must ensure proper completion of Form I-9 for each individual they hire for employment in the United States*, whether that individual is a citizen or not. *See* https://www.uscis.gov/i-9 (last accessed Feb. 17, 2019).

[28] Magellan administers some state Medicaid plans, as well as the Michigan Medicaid prescription-drug program.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

felons with multiple convictions, have been and, on information and belief, still are on the Centria payroll, often rendering care *unsupervised* in the homes of Centria clients.

75.     On June 4, 2017, Dr. Margaret Ficaj, a BCBA working for Centria, wrote a letter detailing some of her concerns about Centria. *See* **Exhibit A**. She wrote, *inter alia*, that what Centria was "marketing to Medicaid patients in Oscoda, Tawa, and West Branch as [a] 'clinic' is not really a legal clinic because there is not [a] qualified licensed person running the facility. … There is someone running and organizing the Oscoda facility and representing it as a clinic, [but] she is [a] lead [Behavioral T]echnician who has no certifications whatsoever and only an associate's degree, I understand. Even her supervisor is not a BCBA and is not yet certified." *Id.*

76.     A parent whose children received services through Centria's autism center in Wyandotte reported that the Centria clinicians there were woefully undertrained and did not understand HIPAA regulations, among other things.

77.     Centria's use of under-qualified, under-trained, and inappropriately vetted personnel has led to numerous incidents of abuse and other violations of the rights of Centria clients. Parents have reported that their children's conditions have actually worsened under Centria's "care," in part due to the lack of training the clinicians receive.

78.     Relators are personally aware of at least one instance when, after the issue of under-qualified clinicians was raised internally, several high-level employees of Centria worked at the direction of Defendant Scott Barry to cover up the fraud by falsifying documents. These employees included John Cotcher (then Chief Talent Officer, currently V.P. for Special Projects), and Defendants Michelle Carter Pierce (in-house counsel) and Alicia Decker Kidwell (V.P. for Autism Services).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

79.    Relator Pawlak was informed by another Centria employee that this and other kinds of fraud were occurring in Centria's operations in Saginaw County, and that when the employee had reported this to Defendant Alicia Decker Kidwell, she told him in sum and substance not to worry about it, because if they ever "got caught" they would just "claim negligence."

80.    In approximately December 2017, Defendant Barry told Relator Gates not to discuss clinicians' qualifications with Relator Pawlak, saying in sum and substance that as Chief Compliance Officer, Pawlak was "the enemy and not our friend."

81.    Relator Gates is familiar with the issue of unqualified and under-qualified clinicians from her work as Manager of Centria's Training Program. During her tenure at Centria, Relator Gates helped set up a program whereby Centria had its new hires take online training provided by the University of North Texas (UNT). John Cotcher, then Chief Talent Officer for Centria, with the full knowledge of and/or on the instructions of Defendant Barry, had Relator Gates arrange for pairs of BCBA students in the UNT program to supervise each other, even though neither was yet qualified.

82.    On January 18, 2017, Relator Pawlak emailed a letter to Defendant Barry entitled "Medicaid Fraud Alert," in which she described Centria's use of unqualified and under-qualified personnel in the field. **Exhibit B**. Pawlak wrote:

> a.  "Centria currently has practitioners delivering care in the Qualified Behavioral Health Professional (QBHP) capacity" who were qualified only as BTs, and that some Centria QBHPs were "actively overseeing cases without meeting state requirements to perform in such a supervisory role. Further, Centria is knowingly billing the state Medicaid Program for services delivered by unqualified QBHPs after the state discovered in a 2016 MI DHHS/Wayne County audit that three of Centria's practitioners were in such violation. … The specific QBHP qualifications were clearly outlined to Centria at that time and Centria was directed to discontinue any and all occurrence[s] of this violation." *Id.*, at 1.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

    b.  "[However, on] January 12, 2017 it was disclosed to me that the violation was not only still occurring, but that it had grown to approximately 52 affected client cases. Upon further investigation, 27 cases are in process of being staffed with an unqualified professional, and 25 have been staffed ongoing with unqualified professionals …. Not only is Centria willfully jeopardizing the treatment and care of its clients, it is in violation of the False Claims Act whereby claims for [care rendered by] unqualified professionals are being submit[ted] to Medicaid for payment …." *Id.*

    c.  "[Y]ou have ignored [my requests to meet with you to discuss the issue] and have further instructed staff … [not] to raise any compliance concerns to me, and further told them that 'Vanessa is the enemy and not our friend." *Id.*, at 2.

83.    As Chief Compliance Officer, Relator Pawlak requested that Barry promptly "confirm [his] understanding of this compliance memo and Medicaid Fraud Alert," remove all personnel from serving in roles for which they were not qualified, "ascertain the exact damages of the cases affected by this violation," and "self-disclose this violation … to the Michigan Medicaid Office at the MI DHHS for further handling." *Id.*

84.    Relator Pawlak was terminated approximately two weeks later, on February 3, 2017, after a sham "investigation" by outside counsel Abby Pendleton. *See infra* ¶¶ 132-36.

85.    Relator Gates began looking for a new position immediately after Relator Pawlak was terminated, in large part because she did not want to be implicated in the company's fraud. Relator Gates left Centria voluntarily in approximately August, 2017.

**B.    Defendants presented claims to TRICARE and Michigan Medicaid for ASD services that were not provided**

86.    A former Centria client reported that Centria submitted claims to Michigan Medicaid for the entire month of August, 2017, purportedly for the care of her son, when no care was actually provided. She also reported that Centria submitted Medicaid claims for care that was supposedly provided after she had already begun receiving services from a different provider.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

87.     In one instance in approximately December 2017, when a clinical supervisor went out on maternity leave, her replacement was told by the client family that they had not seen the former supervisor in several months, even though she had submitted hours to Centria, and Centria in turn had been reimbursed for those hours. This was reported to Relator Pawlak in her capacity as Chief Compliance Officer. When Pawlak in turn reported it to Defendant Barry, he advised that instead of reimbursing the payer he would just not bill for something else in the future. Relator Pawlak does not know whether even this *improper* step, or any other step, was ever taken to "remediate" the situation.

88.     A parent whose children received services through Centria's autism center in Wyandotte reported that Centria billed for monthly parent training but that the only parent training she received consisted of a couple of conversations – and that on each occasion Centria billed twice for one conversation, because the parent had two children in the program.

89.     Relator Pawlak was personally informed by a Team Lead in Billing that the Lead had been instructed by Defendant Kyle Kidwell always to bill as much as possible. The Team Lead also reported that the field workers were instructed to pad their reported hours. For example, because therapy units are measured in 15-minute increments, the workers were instructed *always* to wait until the sixteenth minute of a session before logging their time in their iPads. In this way Centria could "round up" and bill for an extra unit, even when the session had actually lasted for less than 16 minutes.

90.     A former billing and payroll coordinator told Relator Pawlak that numerous claims, including Medicaid claims, came across his desk without the signature of a nurse or therapist, meaning that they could not be submitted for reimbursement. The former employee

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

further said that when this happened, Defendant Kyle Kidwell would typically forge a signature and insist that the claim be submitted.

91.     The same billing and payroll coordinator also told Relator Pawlak, in sum and substance, that "[employees] were all told to take all the clinical files home to our houses, even over the weekend to bill, bill, bill as much as we could."

## C.     Defendants presented claims to TRICARE and Michigan Medicaid for ASD services that were not medically necessary

92.     Centria's employees were and, on information and belief, still are pressured to maximize the hours of therapy received by existing clients, regardless of medical necessity. In approximately February 2017, Defendant Barry implemented an initiative called "25 to Thrive," under which BCBAs were pressured to order at least 25 hours of therapy per week for all clients, whether they actually needed it or not. Employees were pressured to keep up that level of "care" – and thus, that level of billing – even as the client *improved* over time.

93.     In her June 4, 2017 letter, Dr. Margaret Ficaj detailed her concerns about this policy. *See* **Exhibit A**. Dr. Ficaj painted a scathing picture of the program, describing it as "set[ting] an upper range of clinically prescribed intensity [of treatment] or hours they [i.e., Centria] heavily impose on their practitioners." *Id.* Dr. Ficaj further stated:

   a.  "They set a consequence for non-conformity to their 'continuity' when they say, 'plans with less than 25 hours will be reviewed and approved by clinical leadership.' They told us in meetings that we should never be prescribing less than 10 hours. As a practitioner, I know that sometimes less than 10 hours does make sense. They track 'hours per plan' and with consequences (administrative review) that will make a practitioner feel that their job is [in] jeopardy for not complying, and reward or kudos for high rates of hours per plan. Their [so-called] clinical leadership that are reviewing are not necessarily BCBAs. One of the main producers of this program is a business man and not a clinician at all." *Id.*

   b.  "They advise practitioners to assign hours based on age versus medical necessity … saying that all children ages 1-6 should [receive] comprehensive treatment planning, and that comprehensive is 25-40 hours. … ***They are***

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

*sending us out to sell hours for them and they make that very clear in their company meetings and in their tracking* ….” *Id.* (emphasis added).

c. “They told us at a company meeting, ‘The smart person will create 5 patients at 40 hours a week and the unsmart person will have 20 patients at 10 hours a week.’ If we prescribe those hours and the patient does not want those hours, we have to send that patient denial of those hours back to the ‘clinical review’ (which means company administration). That leaves the practitioner fearing … did I not sell good enough?” *Id.*

d. “We have weekly meetings with ‘clinical directors’ where the focus has nothing to do with clinical stuff and is 100% sell-sell-sell. My [C]linical Director even has a wheel he spins to divvy out gift cards for whomever brings in more billable hours. They do companywide announcements and kudo’s to make example of people who have the ‘highest rates of hours per plan.’” *Id.*

94.     Dr. Ficaj has similarly harsh things to say about Centria’s Quality Assurance and Progress Improvement (“QAPI”) program, describing it as “tak[ing] the whole 25 to Thrive thing a step further” by providing “a ‘metric’ or ‘scorecard’ to us as ABA practitioners. One of the things [they] are ‘scoring’ us on [is] going out and doing more initial assessments and treatment plans. This is tied to the number of hours they want us to output, and those output numbers are tied to bonuses. It is all tied to their utilization goals, and by utilization they don’t just mean fulfilling billable hours associated with the amount/scope/duration of patients already in service, they are referring to prescribing hours in recommendations for potential patients (25 to Thrive). *This is all about money; it isn’t about clinical quality*.” *Id.* (emphasis added).

95.     Centria’s Client Services Managers were also pressured to open as many new cases as possible, without requiring that the cases first meet certain readiness and compliance requirements. CSMs are incentivized through bonuses for case openings and increasing billable hours, rather than for patient/family satisfaction or other positive outcomes. CSMs who refused to follow these practices to fatten Centria’s bottom line were promptly terminated.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

96.     The rewards and punishments built into the 25 to Thrive and QAPI programs led Centria personnel to order (and then bill for) therapy that was not medically necessary. For instance, in approximately January 2017, Defendant Steven Merahn, M.D., explained to Relator Pawlak that, in keeping with the "25 to Thrive" initiative, he needed to ensure that all children who came through Centria had at least 25 hours per week of therapy services ordered, and that in order to accomplish that he had assigned an employee to "clean up" the clinical documentation. Defendant Merahn further told Relator Pawlak that this "clean up" involved copying clinical notes from the file of a patient who *did* have a legitimate need for that level of care and pasting those notes into the files of other patients to make it *appear* that they had the same therapeutic needs, whether they actually did or not.

97.     Defendant Merahn further explained to Relator Pawlak that the cut-and-paste job had resulted in errors – for instance, a patient's file having a different patient's name in the notes.

98.     Relator Pawlak immediately advised Defendant Merahn against this cut-and-paste and clean-up operation, but he told her that the whole project was almost finished. He further indicated that, as Chief Compliance Officer, Relator Pawlak had much bigger problems to worry about, and that she would be probably be questioned about those problems if Centria were ever investigated.

**D.     Defendants presented claims to TRICARE and Michigan Medicaid that were tainted by kickbacks**

99.     Relator Pawlak was told in approximately December 2016 that Defendants Barry and Decker Kidwell had instructed Centria's Client Service Managers to waive co-insurance and/or co-pays, including Medicaid co-pays, for new patients who signed up with Centria, and to not require documentation of financial hardship.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

100.    Relators are also personally aware of at least one instance where Centria paid a patient's rent – disguised on the books as a monthly $1,000 "caregiver bonus" – to induce that patient to switch to Centria for Private Duty Nursing services.

101.    Relator Pawlak repeatedly raised her concerns about such kickbacks with Centria management, including Defendant Darren Schwartz, who dismissed her concerns.

102.    Centria maintains a cozy relationship with Lipton Law, a Detroit-area personal-injury firm that is a major source of referrals. In May 2014, Elliot Chocron, the husband of a Lipton Law partner, became Centria's Director of IT, and then Chief Technology Officer in June, 2017. And on information and belief, when Defendant Scott Barry vacations in Boca Raton, Florida, he often stays at a condo belonging to Lipton Managing Partner Jody Lipton.

103.    During Relators' tenures, Gina Steigerwald, who was at the time the wife of Defendant Jeff Steigerwald,[29] ran her own business out of an office at Centria corporate headquarters. That business located, rented, and retrofitted housing for individuals who had been disabled in auto accidents, and Centria and her company frequently referred to each other.

104.    Dr. Margaret Ficaj wrote in her June 4, 2017 letter: "I can give you a list of probably 10 [Behavioral] [T]echnicians that do or have provided transport … so that patients can have service at Centria['s] so-called 'clinics' in Oscoda and West Branch" – thus offering a "convenience that makes it more likely the patient will choose Centria. Other area providers do not offer this …. Centria Client Service Managers (CSMs) market this benefit to patents and offer them 'clinic' availability when they are arranging their services and suggest that their tech will transport the patient to the 'clinic,' even when there is no express 'documented beneficiary eligibility criteria.' General company policy on paying mileage to technicians is that they only get mileage when they are transporting a patient, so there is an incentive to the staff also to

---

[29] Jeff Steigerwald is the cousin of Defendant Chris Wilcox, Centria's President.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

participate. It amounts [to] a lure for patients to choose Centria as their servicer, while concomitantly driving up the cost of federal health-care programs." **Exhibit A**.

105.   Relators are unable to say how many of the patients affected by these or other kickback arrangements were/are beneficiaries of TRICARE, Michigan Medicaid, or the Medicaid programs of other states. However, given that the overwhelming majority of Centria's clients were/are TRICARE or Medicaid beneficiaries, Relators believe it is highly likely that many of the kickback arrangements involved beneficiaries of those two federal programs.

**E.     Defendants presented claims to TRICARE and Michigan Medicaid that were otherwise improper**

**1.     *Forging client signatures***

106.   Relator Moore was personally informed by two different CSMs that their supervisors, Zach Donisch and Defendant Alicia Decker Kidwell, had instructed them to forge parent signatures on care contracts, in order to push as many through the system as quickly as possible. To Relator Moore's knowledge, at least one of these CSMs was eventually terminated for refusing to continue the fraud.

**2.     *HIPAA non-compliance***

107.   All of Centria's claims to TRICARE and Medicaid are tainted by Centria's false certifications of compliance with the privacy provisions of the Health Information Portability and Accountability Act of 1996, Public Law 104-191 (HIPAA).

108.   As of 2016, Centria's national workforce numbered approximately 3,800, of which approximately 200 worked at corporate headquarters in Novi. Those employees were given centriahealthcare.com email accounts through Google's corporate gmail capability. However, the remainder of the workforce – including the many thousands of Behavioral Technicians, whose average tenure is approximately six months – used personal email for work

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

communication, without any security checks or efforts beyond the standard procedures of the different service providers. Unfortunately, those efforts are sometimes grossly inadequate.[30]

109.    Because of Centria's policy, HIPAA Protected Health Information ("PHI") has been freely distributed for years and is now sitting in the personal email accounts of thousands of current *and former* employees.

110.    On or about December 2, 2017, Relator Pawlak told Defendant Barry that Centria needed to conduct a Security Risk Assessment, as mandated by the Office of Civil Rights of the federal Department of Health and Human Services. Defendant Barry laughed and said he didn't want to waste money on that because the company was secure. As Pawlak persisted he became grim and said, "don't fucking ask me about it again." Shortly after that conversation, Relator Pawlak learned that Centria had suffered four breaches of its network and that it was not clear what data may have been compromised. These breaches should have been reported to the Office of Civil Rights,[31] but they never were.

111.    In addition, anyone in the company was able to access the medical records of any client, at any time. Hard copies were mixed in the same file cabinets as HR files, and stored in boxes and in stacks on office floors. Electronic medical records were not password-protected, and hard copies were also frequently taken off the premises and then could not be found.

### 3.    *Medically substandard care*

112.    Relators were personally informed by several Centria BCBAs – both former and then-current employees – about a serious issue regarding Centria's treatment of patients with co-occurring disorders. When a BCBA becomes aware that a patient has a co-occurring disorder

---

[30] For instance, in October 2017, it was revealed that in August 2013 all three billion then-existing Yahoo! customer accounts were breached, compromising names, email addresses and passwords. *See*, *e.g.*, https://money.cnn.com/2017/10/03/technology/business/yahoo-breach-3-billion-accounts/index.html (last accessed Feb. 18, 2019).
[31] *See* 45 CFR § 164.408.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

(such as schizophrenia, severe bi-polarity, or other disorders separate from their ASD), best practice and ethical guidelines dictate that ABA therapy be put on hold pending further psychiatric evaluation of the patient.[32] However, these BCBAs reported to Relators that Defendants Scott Barry and Alicia Decker Kidwell, without objection from Centria's Medical Director, Defendant Dr. Steven Merahn, would pressure the BCBA not to put the case on hold but instead to add *more* therapy hours. The BCBAs who raised this issue were ostracized and eventually terminated for not cooperating.

113.    Relator Pawlak received a phone call from the mother of a patient who screamed at her because Centria had sent a nurse who was still recovering from heart surgery to their home. The nurse's own doctor had recommended another week of bed rest and had prescribed narcotics for her pain. But, according to the mother who called Pawlak, the nurse had been told by Defendant Jeff Steigerwald that she would lose her job if she did not meet with the patient – so, to the shock of the mother, the nurse showed up. Defendant Steigerwald took the complaint from Relator Pawlak immediately and later told her it had been handled.

114.    Relator Pawlak also received a complaint from the mother of a patient whose Centria clinician had arrived at their home to conduct a session while *admittedly* high on drugs. Relator Pawlak was later told by the mother that Centria had threatened to sue her for publicizing the clinician's HIPAA-protected information, and that the mother had written to then-Lieutenant Governor Brian Calley about the situation. Relator Pawlak does not know whether or how the complaint was resolved.

---

[32] This is warranted because, for instance, a co-occurring disorder might cause a patient to act out violently, putting both patient and the clinical team at risk and limiting the potential for progress from the ABA therapy.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

115.     One parent whose children received services through Centria's autism center in Wyandotte reported that children were horribly mistreated at the center, including having to use potties on the floor, in front of other children, because the center had no bathrooms.

**C.     The 2018 DWNHA Audit**

116.     In an audit of *just one month's records* for *just five Centria clients*, in *just one county* of *just one state*, the Detroit Wayne Mental Health Authority found examples of several of the kinds of fraudulent conduct described herein. *See* **Exhibit C**.

117.     This audit *by* DWMHA was conducted in response to a 2018 "'post-paid' financial audit" *of* DWMHA by the MDHHS Office of Inspector General, *see* Exhibit B to *id.*, and resulted in a "Preliminary Findings Report," *see* Exhibit A to *id.* (the "DWMHA Audit Report"), at 2.

118.     The DWMHA Audit Report (which refers to the Centria patients as "consumers") details that, *inter alia*:

    a.  "Consumer *915449/NJ* was scheduled more ABA services than parents were able to commit to. The ABA hours increased from 20 to 27, while the parents stated they could only commit to … 15 hours per week. The Behavior Tech had the family sign-off for three days of services (5/16 – 5/18/17) on the same day (5/18/17). On 5/8/17, the BT fell from a chair while at the family home and went to Urgent Care. The supervisor documented on 5/9/17, they were at Urgent Care with the BT for 2.5 hours. The provider billed for the ABA services [during that time] even though they were not provided and signed initials as the parents' signature …. The BT did not provide services on 5/10/17; however, claims were submitted for that day."[33]

    b.  "Consumer *1404951/CH* Parental signature does not match for services provided during the entire month of May 2017. … **Recoup all ABA services provided in May 2017.**"[34]

    c.  "Consumer *1459799/JC* the family did not receive training once per week as required. … The provider submitted claims for dates of service when the services were not provided; either the BT cancelled or the family cancelled or

---

[33] DWMHA Audit Report, at 2.
[34] *Id.* at 3 (emphasis in original).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

the signature did not match the parent's authorization signature. Additional recoupment for payment of services not provided on 6/7/17 for $220.00. Documentation the BT cancelled the session. On 7/11/17, services were not provided as the family cancelled and the supervision was double billed. On 7/28/17, services were not provided as the family cancelled."[35]

d.   "Consumer *1442009/HZ* … BT and supervision were attempted to be provided to the consumer either prior to her having a seizure or seizures; after and during her ABA services. The documentation submitted stated the consumer was disoriented and unable to grasp the ABA techniques during the seizure activity. It was also documented the consumer would take a nap. …"[36]

119.   The DWMHA Audit Report recommended that the agency "[o]btain recoupment for claims submitted on days when services were not provided. The approximate amount of recoupment for May 2017 is $13,068.50," *id.* – again, from an analysis of *just one month's records* for *just five Centria clients*, in *just one county* of *just one state.*

120.   Relators do not know whether Centria has refunded this or any amount to DWMHA.

**D.    Other Non-Compliance**

121.   When a Community Mental Health Service conducts an audit of clinicians' qualifications, it will typically notify the provider ahead of time which clinicians' files will be audited. Relators are personally aware that, on more than one occasion when Centria received notification of an impending CMHS audit, Defendant Scott Barry pulled workers out of Billing and made them work extra hours to "correct" the files that had been chosen for audit, including by forging training credentials. The Billing personnel were promised bonuses if they were able to get all the files ready for the audit.

122.   In approximately December 2016, Defendant Barry told Relator Pawlak – who was, after all, the Chief Compliance Officer – *not to spend time on compliance issues* but instead

---

[35] *Id.*
[36] *Id.*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

to work on increasing monthly collections. Barry told her that the forty employees handling billing should be producing more monthly revenue, and that she should use her engineering skills and "lean operations" background to redesign the billing operation instead of spending time on compliance matters that were just going to cost him more money to fix.

123.    In approximately December 2016, while preparing the 2016 Compliance Report required under Centria's contract with the Macomb County Community Mental Health Authority, Relator Pawlak learned that Defendant Alicia Decker Kidwell, Centria's V.P. of Autism Services, had hidden from Pawlak numerous reports of substantiated investigations of child abuse by clinicians and other rights violations the county had sent to Centria. When Relator Pawlak confronted her, Defendant pulled from the bottom right drawer of her desk a stack of such reports that she had simply ignored.

124.    A former Centria employee told Relator Moore personally that she had been instructed by Defendant Alicia Decker Kidwell to delete computer records of any child's six-month ABA autism assessment that had been altered to falsely show that the child needed more hours of therapy than the child's medical records would indicate. The employee further told Moore that Defendant Decker Kidwell had requested the deletions while she was attending Moore's deposition in Centria's defamation suit against him. *See infra* ¶¶ 137-39, 144.

125.    In December 2016 and January 2017, Relator Pawlak was personally asked by Defendant Richard Lowenstein to draft policies he could submit as part of the contracting process with Easter Seals/Kaiser Permanente in California, as this was a market into which Lowenstein wanted to expand. Pawlak agreed to do so only if Lowenstein would commit to training employees on the policies and enforcing them, but Lowenstein said that would take too

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

much time. As a result, Pawlak never wrote the requested policies, yet shortly after her termination, Centria began operating in California and continues to do so to this day.

126.    After Centria became established in California, Relator Moore was personally told by a former Centria employee that MediCal, the state's Medicaid agency, had found improprieties in Centria's billing and had ordered the company to make corrections. The employee further told Relator Moore that after reporting the problem to Centria executives, she was terminated.

127.    Centria operates a 24-hour telephone help line for its clients. Relators are personally aware that, during their tenures, Centria often staffed this help line on weekends with employees who had no clinical training and would not be able to adequately respond to a caller's clinical emergency.

## E.    Centria silences employees who raise "too many" questions

128.    Numerous Centria employees have been terminated for raising concerns about Company practices. Relators are personally aware of at least seven Centria employees who were terminated for internally raising concerns about fraud. Many employees have faced retaliation of one sort or another even *after* being terminated.

129.    Relators Gates and Pawlak are personally aware of three separate instances when employees who had raised ethical and/or compliance concerns were forcibly locked in conference rooms or offices while Centria managers cleared their desks and other work areas of any documentation of those concerns and then abruptly terminated the employees. The employees were not permitted to use the rest room while being detained, and as a result one of these employees soiled herself before she was finally allowed to leave the premises.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

130.   Centria's Chief Financial Officer, Arthur Taylor, simply disappeared in approximately November 2016. His company vehicle was later found abandoned in Toronto.

131.   Relators Curtis Moore and Vanessa Pawlak, who were Senior Sales Executive and Chief Compliance Officer, respectively, were terminated for asking too many questions about Centria's fraudulent operations, as described more fully below.

## VII.
## RELATORS' RETALIATORY TERMINATIONS, THE STATE-COURT LITIGATIONS, AND SUBSEQUENT DEVELOPMENTS

A.   **Relator Pawlak's Retaliatory Termination**

132.   From almost the very beginning of her brief tenure as Centria's Chief Compliance Officer, Relator Pawlak frequently raised concerns about the ethics and legality of the company's practices to Defendants Barry and Mitchell and the rest of Centria's management, but her concerns and warnings fell on deaf ears, until they culminated in the "Medicaid Fraud Alert" email she sent to Barry on January 18, 2017. *See* **Exhibit B**; *see also* ¶¶ 82-83, *supra*.

133.   In that email, Relator Pawlak specifically raised the concern that Centria was committing Medicaid fraud and thereby creating liability for itself under the False Claims Act. *See* **Exhibit B**, at 1.

134.   Centria's outside counsel Abby Pendleton undertook an "investigation" in response to Relator Pawlak's "Medicaid Fraud Alert." But Pendleton's "investigation" was intended from the start simply as a whitewash. For instance, Pendleton interviewed Relator Pawlak, but then omitted several key things that Pawlak told her from her final report.

135.   Defendant Mitchell personally terminated Relator Pawlak shortly thereafter, on February 3, 2017. The termination was purportedly for sending confidential company information to her personal email account.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

136.    However, since (a) the company has no established policy against the use of personal email, (b) in fact, most if not all of the company's field employees have no recourse *other than* to use personal email because the company does not supply them with work accounts, and (c) the company takes essentially no precautions itself to safeguard sensitive information, *see* ¶¶ 107-11, *supra*, the stated reason for Pawlak's termination was obviously pretextual.

**B.    Relator Moore's Retaliatory Termination;
      Relators Contact the Authorities and are Contacted by the Press**

137.    Relator Moore also had concerns about the ethics and legality of many of the company's practices, and raised these concerns on numerous occasions to Defendants Lowenstein and Wilcox, and to Comptroller Greg Ralko.

138.    Relator Moore was eventually terminated on or about May 8, 2017, purportedly for not meeting sales goals. Like Centria's trumped-up reason for firing Relator Pawlak a few months earlier, the company's reason for firing Moore was pretextual.

139.    Almost immediately after Moore's termination, Centria filed a lawsuit against him in Oakland County Circuit Court,[37] alleging that Moore had breached a non-compete clause in his employment agreement. Centria later filed an additional suit, against Moore's company.[38] Relator Moore then filed a suit against Centria, Defendant Barry, and Defendant Schwartz, alleging wrongful termination, violation of the Whistleblower Protection Act, breach of contract and violation of the Sales Commission Act.[39] These actions were eventually consolidated for arbitration (the "Moore Arbitration").

---

[37] No. 2017-158868-CB.
[38] No. 2017-159907-CB.
[39] No. 2017-160204-CK.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

### 1. The "Law Enforcement Summary"

140.    Meanwhile, in May 2017, Relators Moore, Pawlak, and Gates compiled a document they called the "Law Enforcement Summary." **Exhibit D**. In that document, Relators made allegations similar to those that they make herein: that Centria, *inter alia*,

    a.  engaged in conduct that is "harmful to hundreds of patients, their families, and particularly harmful to children ages 2-21 receiving autism therapy through Applied Behavioral Analysis (ABA) services";

    b.  committed "criminal and civil wrongdoings, such as but not limited to: Racketeering, Billing Fraud, Clinical Workforce Qualifications, Provider Credentialing, workforce Documentation, Unqualified Labor, Employment of Excluded Clinicians and/or other Felony Convicts, Employee Terminations, HIPAA Privacy & Security, Administration of Drugs, Physical Safety of Centers, Audit Wrongdoing, Ethical and Quality of Care offenses";

    c.  "forge[d] parent signatures on care contracts or otherwise sign[ed] off as the child's parent in the system for those parents who exhibit broken English and are uncertain of the services Centria is pressing on their family"; and

    d.  "falsif[ied] reports to [its] insurers saying that Centria is appropriately background checking their workforce, when in fact they are not."

141.    Beginning approximately July, 2017, Relator Moore sent the Law Enforcement Summary to various entities, including but not limited to most if not all of the CMHSPs with which Centria had contracts, and the Michigan Attorney General's Office. Relators also personally delivered copies of the Law Enforcement Summary to the FBI Field Office in Detroit, on two separate occasions in July and August, 2017.

142.    The Michigan Attorney General's Office eventually met with Relators Moore and Pawlak in approximately January 2018, and stated that they would begin an investigation.

143.    Defendant Barry and the rest of the company's executive management soon became aware that the Law Enforcement Summary had been circulated, and on December 20, 2017, Barry, Wilcox, Lowenstein, Alicia Decker Kidwell, Kyle Kidwell, Steigerwald, Schwartz, and Centria filed a complaint in Oakland County Circuit Court, alleging defamation, conspiracy,

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

tortious interference with business expectancy, and false light invasion of privacy by Relators Pawlak, Moore, and Gates, along with "John Does 1-10" (the "Defamation Suit").[40]

### 2. *Testimony in Moore's Arbitration*

144.    In Moore's Arbitration, the Centria parties deposed several former employees. It was also revealed in discovery that Moore had previously interviewed some of these employees and others, and had recorded those conversations; transcripts of those recordings were made and became part of discovery in that case. This sworn and unsworn testimony included the following:

### a. Danette Fuentes

    i.  Ms. Fuentes, a former Client Services Manager for Centria in California, told Relator Moore about at least six cases of which she was personally aware, in which BCBA supervisors signed case reports – and billed for their supervisory time – without having actually provided supervision.[41] She also discussed an instance where she was instructed to reassign a BT from caring for an "aggressive 17 year old" to cover the case of a two year old, because the younger child was approved for more hours and so was more profitable for Centria. As a result, the older child ended up receiving only one-fifth of the hours for which he had been approved.[42]

    ii.  Ms. Fuentes also described new-recruit BTs being "picked off the streets" by Centria and thrown into the job, with the result that at least one parent told her that she "felt like her child was being used as a guinea pig."[43]

    iii.  Ms. Fuentes also described how Defendants Schwartz and Lowenstein made "a big push" in California for the "25 to Thrive" initiative, of which she was very skeptical, saying "I kept fighting them because I just don't, I don't agree with them. If the child requires 25 hours or more I get that …. But if you're just making a push and the child doesn't need it I just, that's not okay. … Darren [Schwartz] would be the one to step in for Rick [Lowenstein] and, you know, he would say 'oh yes, I agree.' But I mean … it was half-assed, you know."[44] Ms.

---

[40] 2017-162709-CZ.
[41] Transcript of "Danetta" audio recording, 4:13-21, 5:9-18, 7:20 – 8:4, 8:19 – 9:5, 10:2-14, 13:1-15 (MR. MOORE: … [T]he mid level was doing the work but the BCBA was signing off on them, correct? DANETTA: Right … the BCBA was signing off on these, on the supervision (naming one of the patients).).
[42] *Id.*, 19:14 – 20:24.
[43] *Id.*, 23:4-13.
[44] *Id.*, 26:22 – 27:9.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

Fuentes expressed her belief that "25 to Thrive" was just about "[m]ore money. I mean this is a lucrative business."[45]

iv. Ms. Fuentes also said that she told Defendant Lowenstein "many, many times" that Centria needed to change its training for BTs because "these people are not, they're not learning anything" through online courses, and that Lowenstein dismissed her concerns.[46]

**b. Kristen Nelson**

i. Kristen Nelson, a former Centria BCBA, testified at deposition that she "had sent documentation of unethical practices to [Centria's] compliance officer, which was Vanessa [Pawlak] at the time. Within a week to two-week period … she [Pawlak] had been fired. And, literally, I want to say within a week to two weeks after her being fired, I was also fired."[47]

ii. In a recorded conversation with Relator Moore, Ms. Nelson described clients telling her that they had not seen their BC for months at a time, even though the BC had submitted "supervision billing, parent training billings, and unfortunately enough, assessments. She supposedly conducted assessments that never took place, she supposedly did parent training that never took place, she apparently provided supervision that did not take place."[48]

iii. As Ms. Nelson told Relator Moore, "We had all the supervision notes, all the assessments, all the parent trainings that were signed and dated"[49] – but these documents were false. Ms. Nelson said she brought this to the attention of Defendant Alicia Decker Kidwell, who decided that Ms. Nelson's *student trainees* should "make up" the hours for which Centria had fraudulently billed. The students pushed back, and Ms. Nelson happened to be present when one student took a call from Defendant Decker Kidwell about it. Ms. Nelson heard Defendant say that, if she were the student, she would "do what I'm told."[50]

iv. Ms. Nelson also told Relator Moore that she discovered that her signature and NPI were stored in Centria's computer system, and might have been used without her knowledge to bill for cases to which she was not assigned. Centria personnel explained that this was a "glitch" that was later fixed, but even after that explanation Ms. Nelson still found the information on the system.[51]

v. Ms. Nelson also told Relator Moore about discovering belatedly that a patient to whom one of her students had been assigned "had been under the care of a psychiatrist for the past four years … [with] all the cornerstone characteristics

---

[45] *Id.*, 27:20-23.
[46] *Id.*, 32:6-14.
[47] Transcript of Deposition of Kristen Nelson, Oct. 31, 2017, 70:23 – 71:5.
[48] Transcript of "KN" audio recording, 3:11-17.
[49] *Id.*, 3:7-9.
[50] *Id.*, 6:2 – 11:7.
[51] *Id.*, 15:24 – 21:6.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

of schizophrenia" and a history of violence. Ms. Nelson said that her "clinical recommendation [was] that this case be put on hold until we can get further information," but that Defendant Decker Kidwell – who had no clinical authority – said that "this case [was] not going on hold." Ms. Nelson mentioned this as an example of a "trend" at Centria of "taking on psychiatric patients."[52]

**c.   Richetta Luechell-Owens Akins**

i.   Ms. Akins, a former HR Coordinator for Centria, testified at deposition that she had heard allegations of Medicaid fraud and HIPAA violations "multiple times from several employees" at Centria, and that such allegations were "a common denominator amongst a lot of employees that came to talk to [her]."[53]

**d.   Breana Jones**

i.   Ms. Jones, a former BT for Centria, told Relator Moore about a supervisor she had for almost a year whose supervision "was horrible. All she did was be on her computer, be on her phone a lot. … [A]ll the time I had her she might have supervised probably maybe a handful of times." This supervisor nevertheless billed for her time.[54]

ii.   Ms. Jones also told Relator Moore that the company had her caring for patients for 19 months before she was scheduled to take required training in recipients' [i.e., patients'] rights.[55]

**e.   Katelyn Haney**

i.   Ms. Jones's comments were echoed by Katelyn Haney, another former Centria BT, who told Relator Moore, "I didn't get Recipient Rights [training] until a year and two months after I was hired in."[56]

ii.   Ms. Haney had more to say about Centria's disregard for training requirements. She told Relator Moore that before coming to Centria she had worked briefly at another agency, where she "shadowed" a more experienced worker for "I think a total of eight hours." When she came to Centria, the company "threw me on my first case and was like 'hey, here you go, here's the plan, do therapy.' … I only had my two day office training and that was it. … I finished that, went right to Macomb County CSM, got my case like three days later, and then started with my kiddo like a week later I think in the middle of June and literally was like here, you [are] paired with him. And this is my first experience [with] ABA therapy pretty much. I had never done one-on-one therapy with clients ever and they [Centria] knew this. … [B]ut at the time like I think two months

---

[52] *Id.*, 21:15 – 24:10.
[53] Transcript of Deposition of Richetta Luechell-Owens Akins, Nov. 27, 2017, 50:15 – 52:23.
[54] Transcript of "Bre" audio recording, 25:1 – 26:9.
[55] *Id.*, 13:11-23.
[56] Transcript of "Katelyn" audio recording, 25:1-3.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

later my BCBA was like 'what do you mean you haven't shadowed [with Centria?]' and then that's when they had me shadow somebody."[57]

iii.  Ms. Haney summed up, "[I]f you don't have all your [training] modules in you're not supposed to be providing services to clients … [but] I was."[58]

**f.  Satoria McGruder**

i.  Satoria McGruder, who like Richetta Akins was an HR Coordinator for Centria, testified at deposition that Centria's focus during her tenure was to hire more BTs to be able to take on more cases, and to ignore the need to make sure current BTs were compliant with training and certification requirements: "[I]t was during the time we had a push and we were hiring several behavioral technicians … I think we hired like 1,000 people in a month and a half or something like that. So … the focus at that time was … to get their files ready so they [could] start working … but while my whole office was working on that, no one was looking at compliance [for existing workers]."[59]

ii.  Ms. McGruder further testified, "At the time my supervisor was Shane Blackmer, and my whole team brought compliance issues to his – to his attention, and his response was '[Defendant] Scott [Barry, Centria's CEO] don't want you to focus on that right now, focus on on-boarding [instead].' … There was no one in the office dealing with compliance at all."[60]

### 3.  *Relators are contacted by the Detroit Free Press*

145.  In late 2017, Relators were contacted by Mark J. Rochester, John Wisely, and/or Elisha Anderson, reporters for the Detroit Free Press, seeking comments on Centria's Defamation Suit against them. This contact led to a number of stories in that newspaper, the first of which – "Centria Healthcare accused of fraud, targeting poor in metro Detroit" – was published on February 11, 2018.[61] *See* **Exhibit E** (the "February 11 Article").

146.  The reporters interviewed Relators several times, and reviewed the large number of documents Relators shared with them. As a result, the February 11 Article contains the very same allegations that Relators make here – that Centria has submitted, and been paid for, (a)

---

[57] *Id.*, 56:18 – 57:3, 57:24 – 58:8.
[58] *Id.*, 54:24 – 55:4.
[59] Transcript of Deposition of Satoria McGruder, Jan. 10, 2018, 57:20 – 58:4.
[60] *Id.*, 26:17-25.
[61] *Available at* http://on.freep.com/2nYLhau (last accessed Mar. 17, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

claims for ASD services that were provided by unqualified personnel, (b) claims for ASD services that were not actually provided, (c) claims for ASD services that were not medically necessary, (d) claims that were tainted by kickbacks, and (e) claims that were otherwise improper.

147.    The February 11 Article also notes that "In recent years, the Michigan Department of Health and Human Services found Centria had been overpaid by Medicaid and sought reimbursement. In one case in 2015, the company was ordered to repay $10,659 for 70 claims with missing or insufficient records. Two years later, the company was cited again, this time for $5,998 for a private-duty [home] nursing bills submitted on seven patients who were hospitalized at the time, according to a review conducted by the Office of Inspector General at the MDHHS." *Id.* This information was provided to the reporters by Relators.

148.    The Article further notes that "the Michigan Attorney General's Office confirmed it [was] investigating Centria, and that the office "has 980 pages of documents that [couldn't] be released" at that time. *Id.*[62]

---

[62] Since Relators provided their information, the Detroit Free Press has published at least six additional stories about problems at Centria:

- "Autism therapy provider's $8 million state grant on hold amid investigation," http://tinyurl.com/Centria-2018-02-16, published Feb. 16, 2018 (explaining that a grant from the Michigan Strategic Fund was on hold pending an investigation of Centria by the State Attorney General's Office);
- "Autism treatment firm lands $8-million state grant, spends big on governor's race," http://tinyurl.com/Centria-2018-02-25, published Feb. 25, 2018 (reporting that Centria was "among the most generous political donors to [the failed gubernatorial campaign of] Lt. Gov. Brian Calley, who backed the company's successful bid for an $8-million state grant"; noting that days after the grant was awarded, Defendant Mark Mitchell, "a key investor and board member of the company hosted a party at his Orchard Lake mansion that formally launched Calley's gubernatorial campaign"; noting also that Centria contributed to the two other candidates in the race);
- "Centria Healthcare accuser pleads no contest to contempt of court," http://tinyurl.com/Centria-2018-02-26, published Feb. 26, 2018  (reporting on Relator Moore's plea in connection with contradictory testimony about whether he signed employment papers);
- "How Michigan's largest autism therapy provider lost $8M grant," http://tinyurl.com/Centria-2018-05-09, published May 9, 2018 (reporting that the grant money was released for other uses when the time to finalize the contract ran out, and that Centria then amended its pleadings in the Defamation Suit to seek the $8 million in damages from Relators);
- "Abuse caught on video at Michigan's biggest autism therapy provider," http://tinyurl.com/Centria-2018-10-05, published Oct. 5, 2018 (reporting that Centria fired a BT caught on video abusing a patient, but lost a $5 million annual contract with Macomb County as a result);

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## VIII.
## RELATORS ARE THE "ORIGINAL SOURCE"
## OF PUBLISHED INFORMATION

149.     Under the False Claims Act, only relators who are an "original source" of the

information upon which they base their allegations may claim a share of the government's

recovery.

150.     The statute contains the following provision:

> The court shall dismiss an action or claim under this section, unless opposed by
> the Government, if substantially the same allegations or transactions as alleged in
> the action or claim were publicly disclosed—
>
>> (i) in a Federal criminal, civil, or administrative hearing in which the
>> Government or its agent is a party;
>>
>> (ii) in a congressional, Government Accountability Office, or other Federal
>> report, hearing, audit, or investigation; or
>>
>> (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the
> action is an original source of the information.

31 U.S.C. § 3730(e)(4)(A).

151.     Further, "original source" is defined to mean "an individual who either (i) prior to

a public disclosure under subsection (e)(4)([A]), has voluntarily disclosed to the Government the

information on which allegations or transactions in a claim are based, or … who [(ii)]

has knowledge that is independent of and materially adds to the publicly disclosed allegations or

transactions, and who has voluntarily provided the information to the Government before filing

an action under this section." *Id.*, (4)(B).

152.     Under Sixth Circuit precedent, Relators here are the original source of the

information on which their claims are based. The Sixth Circuit has held that, "To qualify as an

---

- "Medicaid fraud charges filed in Centria autism investigation," http://tinyurl.com/Centria-2018-11-02, published Nov. 2, 2018 (reporting that two felony charges were brought against a former Centria employee by the Michigan Attorney General's Office) (all last accessed Mar. 17, 2019).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

original source, the relator must have direct and independent knowledge[63] of the information on which the publicly disclosed allegations are based. In addition, the relator must provide the government with the information prior to any public disclosure." *United States ex rel. McKenzie v. BellSouth Telcomms.*, 123 F.3d 935, 944 (6th Cir. 2015).[64]

153.    Here, the "public disclosure" relevant under federal law is the information "from the news media" – that is, the information published in the February 11 Article. Relators clearly have "direct and independent knowledge of the information on which [those] publicly disclosed allegations are based," because it was *their knowledge* that surfaced in the Moore Arbitration and in the Defamation Suit, and led to that February 11, 2017 public disclosure.

154.    Relators also meet the second prong of the Sixth Circuit's test: they "provide[d] the government with the information prior to any public disclosure." *U.S. ex rel. McKenzie*, 123 F.3d at 944. Relators sent the "Law Enforcement Summary" to Main Justice and to the U.S. Attorney's Office for the Eastern District of Michigan well before the February 11 Article was published. They also provided the Government with "written disclosure of substantially all material evidence and information" they possess, pursuant to 31 U.S.C. § 3730, contemporaneous with the filing of this complaint.

---

[63] *See United States ex rel. Antoon v. Cleveland Clinic Found.*, 788 F.3d 605, 619 (6th Cir. 2015) (holding that "'direct' knowledge is knowledge gained by the relator's own efforts and not acquired from the labor of other people"); *id.* at 617 (holding "'independent' to mean that the information known by the relator does not depend or rely upon the public disclosure").

[64] Holding further that "There is no additional requirement that the relator be responsible for providing the information to the entity that publicly disclosed the allegation of fraud as long as the relator provides the information to the government prior to any public disclosure." *Id.*

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

## IX.
## CONCLUSION

155.    Shortly after Centria and the others filed the complaint in the Defamation Suit, Relator Pawlak filed a counterclaim for wrongful termination, and recently amended it to add a counterclaim for defamation. That counterclaim was referred to arbitration, but the original Defamation Suit is proceeding and is now in discovery.

156.    On or about October 29, 2018, the parties settled the Moore Arbitration as well as the claims against Moore in the Defamation Suit, with payment to Moore of an undisclosed sum.

157.    On or about March 19, 2019, Relators became aware that the Health Care Fraud Division of the Michigan Attorney General's Office had released its report on its investigation of Centria. *See* **Exhibit F**.[65] Relators take issue with many of the findings, which seem to show that the investigation was somewhat limited. In any event, far from exonerating the company, the report simply recommended that the investigation be closed only because it "did not uncover sufficient evidence to support a *criminal prosecution* of Centria." *Id.*, at 10 (emphasis added).

158.    Meanwhile, Centria continues to harass Relators Pawlak and Gates with its vexatious state-court litigation. More importantly, Centria continues its fraud upon the federal government, by knowingly submitting to TRICARE, Michigan Medicaid, and the Medicaid programs of the other states in which it operates:

a.   claims for ASD services that are provided by unqualified personnel;

b.   claims for ASD services that are not actually provided;

c.   claims for ASD services that are not medically necessary;

d.   claims that are tainted by kickbacks; and

e.   claims that are otherwise improper.

---

[65] The report is dated February 8, 2019; however, Relators became aware of it when their attorney for their state-court cases was contacted by the Detroit Free Press for comment, on or about March 19.

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

159.   Relators therefore bring the following claims, and seek the following relief.

## X.
### FIRST CLAIM FOR RELIEF
### FALSE CLAIMS ACT: PRESENTATION OF FALSE CLAIMS

160.   Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

161.   As set forth in detail *supra*, Defendant Centria, through the actions of at least Defendants Barry, Pierce, Decker Kidwell, and Wilcox, and with the full knowledge of all other Defendants, presented or caused the presentation of claims for ASD services that were provided by unqualified personnel. Specifically, Defendants submitted claims for care provided by BTs and for supervision provided by QBHPs who did not meet the requirements set forth in the Michigan Medicaid Provider Manual. *See especially* ¶¶ 67-84; 121; and 144 a., b., d., e., and f., *supra*. These claims were legally false when presented, in that Defendants falsely certified when presenting them that they complied with all applicable state and federal statutes, rules and regulations.

162.   Defendant Centria, through the actions of at least Defendants Barry, Decker Kidwell, Kyle Kidwell, and Wilcox, and with the full knowledge of all other Defendants, also presented or caused the presentation of claims for ASD services that were not actually provided. Specifically, Defendants submitted claims on behalf of no-show BTs and supervisors. *See especially* ¶¶ 86-91; 116-20; 144 a., b., and d.; and 147, *supra*. These claims were legally false when presented, in that Defendants falsely certified when presenting them that they complied with all applicable state and federal statutes, rules and regulations; that they were "true, accurate, and contained no false or erroneous information"; and that "the services billed were actually

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

provided." These claims were also factually false, in that the services billed were *not* actually provided.

163.   Defendant Centria, through the actions of at least Defendants Barry, Decker Kidwell, Lowenstein, Merahn, Schwartz, and Wilcox, and with the full knowledge of all other Defendants, also presented or caused the presentation of claims for ASD services that were not medically necessary. Specifically, Defendants submitted or caused others to submit claims for a higher level of service than their clients actually needed, as a result of the "25 to Thrive" and QAPI programs and other policies of Centria. *See especially* ¶¶ 92-98; 118 a.; and 144 a., *supra*. These claims were legally false when presented, in that Defendants falsely certified when presenting them that they complied with all applicable state and federal statutes, rules and regulations; that they were "medically indicated and necessary to the health of [the] patient"; and that they were "within the limitation of Medicaid," in that they were "medically necessary."

164.   Defendant Centria, through the actions of at least Defendants Barry, Decker Kidwell, Schwartz, and Steigerwald, and with the full knowledge of all other Defendants, also presented or caused the presentation of claims that were tainted by kickbacks. *See especially* ¶¶ 99-105. These claims were legally false when presented, because they were violations of the Anti-Kickback Statute, and so were *per se* violations of the False Claims Act. *See* 42 U.S.C. § 1320a-7b(g).

165.   Defendant Centria, through the actions of at least Defendants Barry, Decker Kidwell, Merahn, Steigerwald, and Wilcox, and with the full knowledge of all other Defendants, also presented or caused the presentation of claims that were otherwise improper. Specifically, Defendants presented or caused to be presented:

     a.   claims that resulted from forged client signatures, *see* ¶¶ 106; 118 b., c.;

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

    b.    claims tainted by Defendants' false certification of HIPAA compliance, *see* ¶¶ 107-11; 144 c.; and

    c.    claims for medically substandard care, *see* ¶¶ 112-15; 118 d.; 144 b. *v.*

These claims were legally and/or factually false when presented.

166.    Defendants knew the claims set forth above were false and fraudulent, or they recklessly disregarded or were deliberately indifferent to the possibility that they might be so. Accordingly, Defendants knowingly presented false and fraudulent claims to TRICARE and Medicaid for payment in violation of 31 U.S.C. § 3729(a)(l)(A).

167.    The submission by Defendants of these false and fraudulent claims caused the United States, through its TRICARE and Medicaid programs, to pay out sums that it would not have paid if CMS and the DOD had been made aware of the falsity of Defendants' claims and certifications.

168.    Each false or fraudulent claim submitted to the United States is a separate violation of the FCA.

169.    By reason of the false or fraudulent claims that Defendants knowingly presented, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relators therefore respectfully request an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relators the maximum award permitted under 31 U.S.C. § 3730(d).

**XI.**
**SECOND CLAIM FOR RELIEF**
**FALSE CLAIMS ACT: MAKING OR USING**
**FALSE RECORD OR STATEMENT TO CAUSE FALSE CLAIM TO BE PAID**

170.    Relators repeat and re-allege all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

171.    As described above, throughout the statutory period, Defendants knowingly made and used, or caused to be made and used, records and statements that reflected: (a) ASD services that were provided by unqualified personnel; (b) ASD services that were not actually provided; (c) ASD services that were not medically necessary; (d) claims for ASD services that were tainted by kickbacks; and (e) claims that were otherwise improper.

172.    Defendants then knowingly made and used false certifications with respect to claims based on those records and statements.

173.    Accordingly, Defendants knowingly made and used, or caused to be made and used, false records or statements material to false or fraudulent claims to TRICARE and Medicaid for payment, in violation of 31 U.S.C. § 3729(a)(l)(B).

174.    The making and use by Defendants of these false records and statements caused the United States, through the TRICARE and Medicaid programs, to pay out sums that it would not have paid if CMS and the DOD had been made aware of the falsity of Defendants' records or statements.

175.    Each use of a false record or statement material to a false or fraudulent claim to the United States for payment is a separate violation of the FCA.

176.    By reason of the false or fraudulent records or statements that Defendants knowingly created, used, and submitted, the United States has been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relators therefore respectfully request an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relators the maximum award permitted under 31 U.S.C. § 3730(d).

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## XII.
### THIRD CLAIM FOR RELIEF
### FALSE CLAIMS ACT:
### CONSPIRACY TO GET FALSE CLAIMS PAID

177.    Relator repeats and re-alleges all preceding paragraphs of the Complaint inclusive, as if fully set forth herein.

178.    Defendant Mark Mitchell is and was at all times relevant herein a member of the Board of Directors of Centria. In that role – and, as a close friend of Defendant Barry and a major investor in the company – he was involved in strategic business decisions for the company.

179.    In addition, Defendant Mitchell was directly involved in many of the day-to-day business decisions of the company. Relators would see him frequently at Centria's offices, meeting with Defendant Barry and/or other members of the executive team.

180.    Relator Pawlak was personally informed by Defendant Barry that it was because of Defendant Mitchell's insistence that Centria employed a Chief Compliance Officer. Mitchell was the last person to interview Relator Pawlak during her hiring process, and he personally fired her a few weeks later.

181.    Defendant Mitchell and each of the other Defendants knew or had reason to know of the pattern of fraud described herein. On information and belief, Defendant Mitchell was aware of and gave his assent to the "25 to Thrive" and QAPI initiatives described herein, both of which caused the filing of claims for services that were not medically necessary. *See* ¶¶ 92-98, 118 a.; 144 a.; and 164, *supra*.

182.    Defendants thereby conspired to get false claims paid, in violation of 31 U.S.C. § 3729(a)(l)(C).

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

183. By reason of this conspiracy the United States, through its agencies CMS and the DOD, has paid out sums that it would not have paid if CMS and the DOD had been made aware of Defendants' conspiracy.

184. The United States has thereby been damaged, and continues to be damaged, in a substantial amount to be proven at trial. Relators therefore respectfully request an order awarding the United States treble damages plus a civil monetary penalty for each violation, and awarding Relators the maximum award permitted under 31 U.S.C. § 3730(d).

## XIII.
## FOURTH CLAIM FOR RELIEF
## FEDERAL FALSE CLAIMS ACT: RETALIATION

### *Relator Pawlak Only*

185. Relator Pawlak repeats and re-alleges all preceding paragraphs of this Complaint inclusive, as if fully set forth herein.

186. As detailed in ¶¶ 132-35, *supra*, Defendants Barry, Mitchell, and Centria retaliated against Relator for her efforts to reveal and put a stop to the fraudulent activity described herein.

187. By reason of Defendants' retaliatory actions, prohibited by 31 U.S.C. § 3730(h)(1), Relator Pawlak has been damaged, and continues to be damaged, in an amount to be determined at trial.

## XIV.
## PRAYER FOR RELIEF

**WHEREFORE**, Relators respectfully request the following relief against Defendants, jointly and severally:

A. That this Court enter an Order requiring Defendants to immediately cease and desist from the conduct described herein and all similar conduct;

**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)**

B.    That this Court enter judgment against Defendants and in favor of the United States, in an amount equal to the damages the United States has sustained due to Defendants' actions, trebled, plus a civil penalty for each violation of 31 U.S.C. § 3729(a)(l)(A), (B) or (C), pursuant to 31 U.S.C. § 3729(a), as adjusted by the federal Civil Penalties Inflation Adjustment Act of 1990;

C.    That this Court award Relators the maximum amount permitted under 31 U.S.C. § 3730(d);

D.    That this Court enter judgment against Defendants and for Relator Pawlak, for the full remedies available under 31 U.S.C. § 3730(h)(2);

E.    And on all Claims for Relief,

1.    An award to the United States and Relator(s), each for the reasonable attorneys' fees, costs, and expenses incurred in prosecuting this action;

2.    An award to the United States and Relator(s) for pre- and post-judgment interest at the rates permitted by law; and

F.    Such other and further relief as this Court may deem just and proper.

## IX.
## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Relators demand trial by jury on all questions of fact raised by the Complaint.

Dated: March 29, 2019           Respectfully submitted,

**BROWN, LLC**

*/s/ Patrick S. Almonrode*
Patrick S. Almonrode
   (*pro hac vice* application forthcoming)
Jason T. Brown
111 Town Place Square, Suite 400
Jersey City, NJ 07310
(877) 561-0000 (office)
(855) 582-5297 (fax)
*patalmonrode@jtblawgroup.com*
*jtb@jtblawgroup.com*

*Attorneys for Relators*
*Samantha Gates, Curtis Moore, and*
*Vanessa Pawlak*

FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)

## CERTIFICATE OF SERVICE

I hereby certify that on March 29, 2019, I caused a true copy of the Complaint in the matter captioned *United States of America ex rel. Gates, Moore and Pawlak v. Centria Healthcare, et al.* to be served upon the following, along with written disclosure of substantially all material evidence and information possessed by Relator:

*by email, and by USPS Registered Mail, Return Receipt Requested, to*

Caroline Burgunder, AUSA
Chief, Affirmative Litigation Unit
United States Attorney's Office
Eastern District of Michigan
211 W. Fort Street, Suite 2001
Detroit, MI 48226
*Caroline.Burgunder@usdoj.gov*

*and by USPS Registered Mail, Return Receipt Requested, to*

Office of the Attorney General of the United States
United States Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

_____
Patrick S. Almonrode