# EXHIBIT F

STATE OF MICHIGAN
DEPARTMENT OF ATTORNEY GENERAL



**DANA NESSEL**
**ATTORNEY GENERAL**

## M E M O R A N D U M

## Request for Approval to Close File

February 8, 2019

TO: David E. Tanay
Division Chief
Health Care Fraud Division

FROM: Jason Evans  JRE
First Assistant
Health Care Fraud Division

Erin Harrington
Assistant Attorney General
Health Care Fraud Division

RE: *Centria Healthcare*
AG No. 2018-0207209-B

### Medicaid-Covered Treatment for Children Diagnosed with Autism Spectrum Disorders

Centria Healthcare is Michigan Medicaid's largest provider of autism services. In 2017, Centria was paid $31.8 million for providing Applied Behavior Analysis (ABA) therapy to Medicaid beneficiaries. ABA therapy is a form of Behavioral Health Treatment covered by Medicaid for children under 21 years of age with Autism Spectrum Disorders (ASD). The goal of ABA therapy is to improve core deficits in communication, social interactions, and restricted behaviors.

According to the Medicaid Provider Manual, before Medicaid will cover ABA therapy, the child must be screened by their primary care provider (PCP). If the PCP determines that further evaluation is necessary, the provider must contact the Prepaid Inpatient Health Plan (PIHP) to arrange for a follow-up evaluation. The PIHP will then arrange for a comprehensive diagnostic evaluation and behavioral assessment to be conducted by a qualified licensed practitioner. The diagnosis of ASD results from this comprehensive diagnostic evaluation. Only a physician or other licensed practitioner working within the scope of their practice can make the

David E. Tanay
Page 2
February 8, 2019

determination of whether ABA therapy is medically necessary for a child.  After a
child is diagnosed with ASD and it is determined that ABA therapy is medically
necessary, Medicaid will authorize ABA therapy for a period not to exceed 365 days.

There are multiple levels of providers who can provide these services to children
diagnosed with ASD.  The lowest level provider is a Behavior Technician (BT).  BTs
do not have specific educational requirements but must receive training from a
professional experienced in Behavioral Health Therapy services.  They must also be
supervised one hour for every 10 hours of treatment provided to beneficiaries.  This
supervision is be conducted by a Board Certified Behavior Analyst (BCBA) or other
professionals, such as a Qualified Behavioral Health Professional (QBHP).

A BCBA is a provider with at least a master's degree who completed a Behavior
Analyst Certification Board (BACB) approved course sequence.  The provider must
also be certified as a BCBA through the BACB.  The BACB is a national entity
accredited by the National Commission for Certifying Agencies.

A QBHP must meet one of the following requirements:

> Must be a physician or licensed practitioner (e.g., Advanced Practice
> RN, Psychologist, Clinical Social Worker, Physician Assistant, etc.)
> with specialized training and one year of experience in the
> examination, evaluation, and treatment of children with ASD

> or

> Hold a minimum of a master's degree in a mental health-related field
> or a BACB approved degree category from an accredited institution
> who is trained and has one year of experience in the examination,
> evaluation, and treatment of children with ASD.  Work within their
> scope of practice, under the supervision of the BCBA, and have
> extensive knowledge and training in behavior analysis.  Extensive
> knowledge is defined as having received documented coursework at the
> graduate level (i.e. **completion of three BACB evaluated graduate
> courses or BACB verified course sequences meeting specific
> standards toward certification) (text added 7/1/18)** from an
> accredited university in at least three of the six following areas:

> - Ethical considerations.
> - Definitions and characteristics; and principles, processes and
>   concepts of behavior.
> - Behavioral assessment, and selecting interventions outcomes
>   and strategies.

David E. Tanay
Page 3
February 8, 2019

- Experimental evaluation of interventions.
- Measurement of behavior, and developing and interpreting behavioral data.
- Behavioral change procedures and systems supports.

Starting September 30, 2020, a QBHP must also be a Board Certified Behavior Analyst (BCBA) certified by the BACB.

## Complaint Regarding Centria

On December 15, 2017, former Centria Compliance Director Vanessa Pawlak sent a letter to the FBI, the U.S. Attorney's Office for the Eastern District of Michigan, and the Health Care Fraud Division (HCFD) with the subject line "Centria Healthcare Investigation – Requesting Immediate Government Intervention and Status Update." Ms. Pawlak served as the Centria Compliance Director for about two months, from late November 2016 to February 3, 2017. In her letter, Ms. Pawlak wrote that on August 30, 2017, she went into the FBI Detroit Field Office and reported "healthcare crimes I was witness to regarding fraud, fraud cover up, racketeering, and other serious wrong doing." Special Agent (SA) Jim Wood confirmed that the FBI is not investigating Centria.

After receiving the letter, the HCFD opened the case full scale. First Assistant Jason Evans contacted Ms. Pawlak's attorney John Harrington to set up a meeting. On January 18, 2018, Ms. Pawlak and former Centria Senior Sales Executive Curtis Moore, co-complainant, met with First Assistant Jason Evans and SA Wood regarding their claims that Centria was committing Medicaid Fraud. Mr. Moore worked at Centria from August 2015 to May 2017. Ms. Pawlak's and Mr. Moore's general allegations included claims that Centria was defrauding Medicaid by: 1) billing for services that were not rendered, 2) utilizing employees who lacked the proper training to provide ABA therapy, 3) diagnosing children as having ASD when they did not, 4) providing more services than necessary, and 5) hiring people with criminal backgrounds.

In addition to statements Ms. Pawlak and Mr. Moore made during the January 18 meeting, they left a box of documents and other materials they claimed helped establish Medicaid Fraud (this box was entered into evidence). Because of concerns that some of the materials left by Ms. Pawlak and Mr. Moore were protected by the attorney-client privilege, the HCFD utilized a taint team from the Attorney General's Corporate Oversight Division to review the information. The taint team returned documents to attorney John Harrington that were believed to be protected by the attorney-client privilege. After the taint team completed its privilege review and returned the potentially protected materials, SA Wood met with Mr. Moore to get more information about the materials in the box. Ms. Pawlak also provided a

David E. Tanay
Page 4
February 8, 2019

list of Centria employees with a narrative explaining what fraud they were
potentially aware of and what they were willing to discuss with our office.

**Investigation**

1. **Centria allegedly billed for services not rendered**

Ms. Pawlak and Mr. Moore alleged that Centria was billing for services that were
not rendered. SAs Jim Wood and Joe Dionise extensively investigated this
allegation. They first obtained a list of the 15 beneficiaries receiving the most ABA
therapy from Centria. SA Dionise interviewed the parents/guardians of these
beneficiaries. SAs Wood and Dionise then obtained a random sample of
beneficiaries from the Detroit area (this is where Ms. Pawlak stated that the
criminal activity was taking place) who were receiving services from Centria. SAs
Wood and Dionise contacted and interviewed the parents of many of these
beneficiaries. In total, they conducted over 50 interviews with parents/guardians of
beneficiaries who were receiving services from Centria.

From the interviews with the parents/guardians of beneficiaries, SAs Wood and
Dionise found that most parents did not keep a record and could not say definitively
whether services were provided on specific days. Nevertheless, none of the
individuals interviewed provided any evidence to support the claim that Centria
billed for services not rendered. Additionally, almost all the parents were satisfied
with Centria's services. Some even acknowledged that their children had made
significant progress through Centria's autism services. The information that SAs
Wood and Dionise gathered from these interviews does not corroborate Ms.
Pawlak's and Mr. Moore's allegation that Centria billed for services it did not
provide.

While the HCFD investigation did not uncover evidence that billing for services not
rendered was directed by management, the investigation did uncover evidence of
possible fraud by a former Centria employee. This evidence was contained in
materials the HCFD received from the Michigan Department of Health and Human
Services Office of Inspector General (MDHHS OIG). Prior to the HCFD requesting
the MDHHS OIG investigation materials, MDHHS OIG had chosen not to refer the
matter to HCFD because Centria voluntarily paid back the money it received from
Medicaid for the false billings and terminated the employee after it was informed of
the potential fraud. The HCFD opened a separate file for the criminal investigation
into the employee's alleged fraud and the person has since pled guilty to Medicaid
Fraud.

The OIG materials also referenced a complaint from Macomb County Community
Mental Health (MCCMH) indicating that providers at one of Centria's Autism

David E. Tanay
Page 5
February 8, 2019

Centers allegedly failed to provide the ABA therapy billed. In the complaint, there was reference to one of the providers pushing a child and spraying the child with Febreze. The Macomb County Prosecutor's Office charged the provider with 4th degree child abuse for this incident and she was ultimately convicted. The HCFD opened a separate criminal investigation into the alleged fraud. That investigation is still pending.

The OIG materials included one other child abuse complaint involving a Centria employee. MCCMH Services Office of Recipient Rights investigated the complaint. There was no evidence of child abuse, but MCCMH found evidence supporting a rights violation of Neglect Class III, i.e. taking the recipient on an outing with another child. MCCMH recommended that Centria take disciplinary action in compliance with MCL 330.1722(2) and Admin. Rule 330.7035(1). On February 9, 2018, the employee received a written reprimand from Centria for failing to supervise as instructed by the beneficiary's care plan.

Because complainants failed to provide concrete allegations regarding services not rendered that included specific client names, dates, and times, the HCFD casted a wide investigative net to determine if there was any support for the allegation. The investigation did not uncover evidence to support this allegation.

### 2. Centria allegedly billed providers at a higher level than their education and training permitted

Before she was terminated, Ms. Pawlak sent a memo to Centria executives captioned "Medicaid Fraud Alert." In this memo, Ms. Pawlak stated that "Centria currently has practitioners delivering care in the Qualified Behavioral Health Professional (QBHP) capacity with qualifications only allowing such professionals to deliver care in a Behavior Technician capacity per formal educational requirements." She went on to state, "Centria is knowingly billing the state Medicaid Program for services delivered by unqualified QBHPs after the state discovered in a 2016 MI DHHS/Wayne County audit that three of Centria's practitioners were in such violation." She provided a list of 25 allegedly unqualified individuals who were supervising ABA therapy provided by BTs. For each of these individuals, she indicated that they were not qualified to serve as QBHPs because they were missing one or two classes refenced on pages two and three.

In response to Ms. Pawlak's memo, Centria CEO Scott Barry contacted Abby Pendleton from Health Law Partners (HLP) to investigate Ms. Pawlak's allegations. Ms. Pendleton and an executive team from Centria conducted an audit based on the list that Ms. Pawlak provided. After reviewing each of the 25 employees' files, they found that the employees were properly credentialed and licensed as QBHPs. Specifically, Ms. Pendleton determined they had the required coursework. On

David E. Tanay
Page 6
February 8, 2019

March 12, 2018, Ms. Pendleton gave a copy of the audit to the HCFD. The audit contained copies of transcripts for the QBHPs that included the coursework that Ms. Pendleton believed showed they met the state educational requirements. Even if we disagreed with Ms. Pendleton's determination that the courses fulfilled the course requirements in the Medicaid Provider Manual, it would be difficult to pursue a criminal action based on reasonable difference of opinion.

Likely because there was room for disagreement regarding which courses fulfilled the state's requirement that a QBHP have coursework in three of six areas, in July 2018 Michigan Medicaid added the requirement that courses must be BACB evaluated.

In addition to HLPs audit, Ms. Pendleton pointed to a separate audit conducted by Detroit Wayne Mental Health Authority (DWMHA) in February 2017 which likewise found no violations. On June 4, 2018, Ms. Pendleton provided the HCFD with a letter from DWMHA (dated March 24, 2017) indicating that Centria's BCBAs and QBHPs were properly licensed and credentialed. Further, as part of an audit mentioned below, Midland County Community Mental Health reviewed the credentials of one of the QBHPs Ms. Pawlak believed was not properly qualified and confirmed that he was qualified to provide supervision as a QBHP.

Ms. Pawlak later alleged that there were 50 to 70 Centria employees who were working as BCBAs but were not properly certified. SA Wood contacted Ms. Pendleton requesting credentialing documentation for Centria's BCBAs. On May 10, 2018, Ms. Pendleton provided a list of 60 BCBAs all of whom had been properly credentialed as BCBAs. Ms. Pendleton established that these providers were properly credentialed as BCBAs by providing their certificates from the BACB.

It should be noted that while our investigation did not uncover evidence to support criminal charges based on billing providers at a higher level, the MDHHS OIG and some of the PIHPs have found instances in which Centria may have used providers who did not meet all the Medicaid Provider Manual requirements to supervise ABA therapy provided by BTs. For example, MDHHS OIG conducted an audit and determined that Centria was paid $14,010.00 in May 2017 for clinical oversight of ABA therapy provided by Behavior Technicians. During that same month, Medicaid paid Centria $593,619.68 for clinical oversight, which means MDHHS OIG potentially found problems with approximately 2.4% of Centria's billings.

Lisa Grost, who oversees Medicaid Autism policy, indicated that the state currently lacks enough qualified QBHPs to provide the required clinical oversight of BTs. As a result, none of the PIHPs are meeting the requirement that BTs must by supervised one hour for every 10 hours of ABA therapy provided to Medicaid beneficiaries.

David E. Tanay
Page 7
February 8, 2019

Since this is a statewide issue, we do not believe this allegation should be pursued through a criminal action. █████████████████████████████████████████

████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

### 3.   Centria allegedly improperly diagnosed children with ASD

Ms. Pawlak and Mr. Moore also alleged that Centria improperly diagnosed children with ASD without providing any concrete examples. As indicated above, SAs Wood and Dionise conducted an extensive investigation by interviewing over 50 parents of beneficiaries who received Autism-related services from Centria. Only one parent, ██████████ expressed any concern about Centria's diagnosis. ██████████ ███, had an evaluation performed by Eastern Michigan Autism Collaborative Center in October 2016 and an evaluation performed by Centria in October 2017. Centria's evaluation determined that █████ had greater impairments. There was no question, however, that █████ had ASD. The only question was to what extent ASD limited ██ abilities. Additionally, after reviewing the evaluations from each provider, the recommended treatment was nearly identical even though they differed in their opinions about █████ abilities.

Further, as mentioned above, the MDHHS Medicaid Provider Manual provides a multi-step process for diagnosing ASD. A Medicaid beneficiary is first evaluated for ASD by a PCP who determines whether the beneficiary needs further evaluation. The PCP then contacts the PIHP for the geographic service area. The PIHP then refers the beneficiary for a diagnostic evaluation and behavioral assessment of ASD. Centria is one provider of autism services that may receive this referral. The process does not give Centria the unfettered ability to diagnose children with ASD, they must first have been screened by a qualified professional. This allegation, therefore, is not supported by the evidence.

### 4.   Centria allegedly provided more services to children than was medically necessary

Centria indicates on its website that "[i]n 2001, the National Research Council Report recommended a minimum of 25 hours per week. In 2007, the American Academy of Pediatrics recommended 20 hours or more of active engagement in evidence-based interventions. These are the minimum number of hours based on research for young children." Centria referred to its recommendation that children with ASD receive 25 hours of ABA therapy per week as "25 and thrive." Ms.

David E. Tanay
Page 8
February 8, 2019

Pawlak and Mr. Moore claimed that "25 and thrive" meant that children were receiving more services than they need.

The evidence does not support a criminal prosecution based on Centria's recommendation that children receive 25 hours or more of ABA therapy per week. As mentioned above, Centria has research to support its claims that this level of service is beneficial. Further, as mentioned previously, Medicaid must pre-approve services before they are rendered. So, before Medicaid would approve this level of service, it must be shown to be medically necessary.

### 5. Centria allegedly hired providers with criminal backgrounds

Ms. Pawlak and Mr. Moore further alleged that Centria was hiring individuals with criminal backgrounds and provided two examples. Initially, SA Wood contacted James Grant, Autism Program Data Analyst with MDHHS. Mr. Grant explained that the credentialing process for employees providing autism services must include disclosure of a criminal record, but that a criminal record does not necessarily preclude employment. Instead, according to Mr. Grant, a prior felony conviction may preclude employment only if the conviction directly relates to providing in-home ABA therapy. The Medicaid provider manual likewise indicates that the felony conviction must relate to the kind of duty to be performed as a BT to preclude the person from serving as a BT. The PIHPs have similar language in their contracts with providers.

This policy position, however, conflicts with Section 18263 of the Public Health Code. According to MCL 333.18263 (which became effective April 3, 2017), "[a]n individual shall not act as a behavior technician in this state unless he or she ... [h]as had a criminal history check conducted and the criminal history check does not contain any criminal history record information for that individual."

Centria's counsel acknowledged being unaware of the Public Health Code requirement. Centria had been following the PIHP and Provider Manual provisions. Centria has now changed its policy to comply with the Public Health Code. Regardless, Centria's counsel indicated that there were only two instances in which Centria hired BTs with criminal backgrounds, which are the same two complainants indicated.

The first instance involved an employee who worked at Centria from August 1, 2016 to February 8, 2017. After hiring this employee, Centria discovered she had not disclosed her prior criminal convictions during the employment application process. When Centria discovered the prior convictions, it terminated her employment.

David E. Tanay
Page 9
February 8, 2019

The second instance involved an employee who was initially not hired because of her criminal background. The employee and her attorney then provided information to Centria showing that her twin sister used her name when arrested in Detroit. Once this error was corrected, Centria hired her and she is still employed there.

The HCFD recommended to MDHHS OIG that Medicaid change the policy regarding the criminal history of BTs so it is consistent with the Public Health Code. The HCFD also made a formal program recommendation regarding this issue to the Medicaid Director.

<u>Additional Investigation</u>

SAs Wood and Dionise contacted six former Centria employees from a list Ms. Pawlak provided. They were able to conduct interviews with five of these employees, but one refused to discuss her employment with Centria. Each complained about Centria rushing to get employees certified as BCBAs and QBHPs, lack of organization and oversight, quality of the training (even though it met state standards), and poor recruitment processes. None of these former employees, however, provided information that would support a criminal prosecution of Centria or its leadership.

Ms. Pawlak later directed SA Wood to another former Centria employee, Lacey Weber. SA Wood found that in June 2017, Ms. Weber had submitted a complaint about Centria on the HCFD website. In this complaint, Weber stated that for about a five-week period during May and June of 2017, a Centria BT was providing services to a beneficiary without supervision from a QBHP or BCBA. Centria, however, was allegedly still billing for QBHP and BCBA services. Weber believed this was happening because she was listed as the supervising BCBA but had refused to provide this service because the beneficiary lived too far away.

The HCFD referred the complaint to the Midland County CMH. Midland conducted an audit and determined that the beneficiary's ABA therapy was properly being supervised by qualified QBHPs. Midland closed the complaint as unsubstantiated. Additionally, HCFD Data Analyst Trina Guy confirmed that Centria did not bill for any services on behalf of Ms. Weber.

Ms. Pawlak frequently sent email correspondence to SA Wood rehashing her complaints. SA Wood requested that she provide her five most serious complaints for further investigation. Ms. Pawlak failed to comply with this request. Ms. Pawlak requested another meeting with the HCFD. On May 7, 2018, SAs Wood and Dionise met with Ms. Pawlak and she did not raise any new issues or complaints.

David E. Tanay
Page 10
February 8, 2019

Conclusion

After reviewing all materials, SA Wood has requested that this investigation be closed because the HCFD investigation did not uncover sufficient evidence to support a criminal prosecution of Centria. We agree with this recommendation.

Although we recommend closing the criminal investigation, as discussed above, ▓

Approved: _____  3/14/2019
                David E. Tanay    Date
                Division Chief

JE:EH:jag:vlk
Att.
c:    Judy Kilduff

CASES/2018-0207209/M.TANAY.190208